# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 1999-CA-00266-SCT

*GERALD BENNETT, AS CONSERVATOR*

*OF THE ESTATE AND PERSON OF JAMES W. BENNETT*

*v.*

*SUDHAKAR MADAKASIRA, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/21/1998 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | KENNETH R. WATKINS |
| ATTORNEYS FOR APPELLEE: | LISA L. WILLIAMS |
| NATURE OF THE CASE: | MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND REMANDED - 03/21/2002 |
| MOTION FOR REHEARING FILED: | 4/19/2002; denied 7/25/2002 |
| MANDATE ISSUED: | 8/1/2002 |

## CONSOLIDATED WITH

## NO. 1999-CA-00755-SCT

*GERALD BENNETT, AS CONSERVATOR*

*OF THE ESTATE AND PERSON*

*OF JAMES W. BENNETT*

*v.*

*ELI LILLY AND COMPANY*

*AND HOFFMANN-LaROCHE, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 04/05/1999 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | KENNETH R. WATKINS |
| ATTORNEYS FOR APPELLEES: | LESLIE JOYNER BOBO |
| | CHRISTY D. JONES |
| | LYNN P. RISLEY |
| | WILLIAM F. GOODMAN, III |
| NATURE OF THE CASE: | MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND REMANDED - 03/21/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**CONSOLIDATED WITH**

**NO. 1999-CA-00756-SCT**

*GERALD BENNETT, AS CONSERVATOR*

*OF THE ESTATE AND PERSON*

*OF JAMES W. BENNETT*

*v.*

*HOFFMANN-LaROCHE, INC.*

*AND JEFFERY A. ALI, M. D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/30/1999 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | KENNETH R. WATKINS |
| ATTORNEYS FOR APPELLEES: | LYNN P. RISLEY |
| | WILLIAM F. GOODMAN, III |
| | LEE DAVIS THAMES |
| | R. E. PARKER, JR. |
| NATURE OF THE CASE: | MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND REMANDED - 03/21/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**CONSOLIDATED WITH**

**NO. 1999-CA-01656-SCT**

*GERALD BENNETT, AS CONSERVATOR*

*OF THE ESTATE AND PERSON OF JAMES W. BENNETT*

*v.*

*JEFFERY A. ALI, M.D.,*

*ELI LILLY AND COMPANY*

*AND HOFFMANN-LaROCHE, INC.*

| DATE OF JUDGMENT: | 09/21/1999 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | KENNETH R. WATKINS |
| ATTORNEYS FOR APPELLEES: | LEE DAVIS THAMES |
| | R. E. PARKER |
| | LESLIE JOYNER BOBO |
| | CHRISTY D. JONES |
| | LYNN P. RISLEY |
| | WILLIAM F. GOODMAN, III |
| NATURE OF THE CASE: | MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND REMANDED - 03/21/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE PITTMAN, C.J., WALLER AND CARLSON, JJ.**

**WALLER, JUSTICE, FOR THE COURT:**

¶1. On October 19, 1994, James W. Bennett ("Jake") killed his wife by stabbing her more than 200 times. He was indicted, tried and found not guilty of murder by reason of insanity and confined at the Mississippi State Hospital at Whitfield. A conservatorship for Jake's estate was established with Jake's son, Kevin, named as conservator.[1] Kevin filed several lawsuits pertaining to Jake's medical care and course of treatment prior to the murder and Jake's subsequent confinement at Whitfield. In the lawsuits Kevin alleges that Sudhakar Madakasira, M. D., a Professor of Psychiatry and Human Behavior at the University of Mississippi School of Medicine and its medical center ("UMMC"), and Jeffery A. Ali, M. D., an Assistant Professor of Psychiatry and Human Behavior at UMMC and a member of University Psychiatric Associates, were negligent in prescribing certain drugs for Jake and that the drugs' manufacturers, Eli Lilly and Company and Hoffmann-LaRoche, Inc., were negligent in failing to warn adequately of the drugs' propensity to cause violent behavior. After summary judgment was granted to each of the four defendants, Kevin filed an appeal to this Court. We reverse and remand for further proceedings.

## FACTS

¶2. In 1994, Jake was being treated by S. H. Subramony, M. D. On August 14, 1994, Jake informed Dr. Subramony that he suspected that his wife was tampering with his medications. Dr. Subramony felt that it was imperative for Jake to see a psychiatrist that day and called the University of Mississippi Department of Psychiatry for a referral. The Department asked Dr. Ali to see Jake.

¶3. Dr. Ali noted that Jake had been prescribed Librium, Doxepin for depression, Librax for stomach problems, and Klonopin for myoclonic jerks, that there had been "an unclear prescribing pattern," and that

Jake had seen many neurologists and internists. Jake was also taking Captopril, Hydrochlorothlorothiazide and Zantac. After examining Jake, Dr. Ali diagnosed major depression with anxiety symptoms. Dr. Ali decided that the best course of treatment would be to continue the Librium, Librax and Klonopin (all manufactured by Hoffmann-LaRoche), and that Prozac (manufactured by Eli Lilly) be added to the medical regimen. Because Dr. Ali had recently moved to Mississippi and had not yet obtained a DEA number which was required for writing certain prescriptions, Dr. Ali consulted with Dr. Madakasira. Dr. Ali explained to Dr. Madakasira that he was hesitant to take Jake off the Librium, Librax and Klonopin all at once because severe withdrawal symptoms might occur. Dr. Madakasira agreed with Dr. Ali's judgment and wrote prescriptions for the Librium, Librax and Klonopin. Dr. Ali wrote the prescription for the Prozac.

## STANDARD OF REVIEW

¶4. We conduct a de novo review of orders granting summary judgment and consider all the evidentiary matters before it--admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. *Aetna Cas. & Sur. Co. v. Berry*, 669 So. 2d 56, 70 (Miss. 1996). A motion for summary judgment may be granted only where there is no genuine issue of material fact; summary judgment is not a substitute for the trial of disputed facts. *APAC-Miss., Inc. v. Goodman*, 803 So. 2d 1177, 1180 (Miss. 2002); *Brown v. Credit Ctr., Inc.*, 444 So. 2d 358, 362 (Miss. 1984). Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite. *Berry*, 669 So. 2d at 70. Where summary judgment is at issue, "[t]he evidence must be viewed in the light most favorable to the party against whom the motion has been made." *Id.* In those instances, "[a]ll that is required of a non-movant to survive a motion for summary judgment is to establish a genuine issue of material fact. . . ." *Simmons v. Thompson Mach. of Miss.*, *Inc.*, 631 So. 2d 798, 801 (Miss. 1994).

## ANALYSIS

### I. WHETHER THE GRANT OF SUMMARY JUDGMENT TO DR. ALI WAS APPROPRIATE.

¶5. Under the Mississippi Tort Claims Act, Miss. Code Ann. §§ 11-46-1 to -23 (Supp. 2001), no state employee is personally liable for acts or omissions occurring within the course and scope of his duties. *Id.* § 11-46-7(2). Physicians who practice medicine at UMMC may be granted immunity from liability for their negligent acts if the acts complained of were committed during the course and scope of their employment at UMMC. *Smith v. Braden*, 765 So. 2d 546, 550 (Miss. 2000). On the other hand, if the acts complained of were committed while the physician was acting as an independent contractor, no immunity is afforded.[2]

¶6. In support of his motion for summary judgment, Dr. Ali submitted a copy of his employment contract with the Board of Trustees of State Institutions of Higher Learning. The contract shows that he would be paid a monthly salary and that, in addition to this salary, Dr. Ali:

[would] be permitted to earn additional income from medical practice subject to the following limitations:

a) [Dr. Ali] shall retain 100% of earnings from medical practice up to a total income of $140,000, . . .

b) Income in excess of $140,000 will be divided 50% to the employee and 50% to the University of Mississippi Medical Center (UMMC). Of the amount allocated to the Medical Center, 60% shall be

for the use of the department of the employee.

\* \* \*

3. [Dr. Ali] agrees to pay [his] pro rata share of expenses in the private patient association (University of Mississippi Clinical Associates). This payment shall be based upon gross medical practice earnings from all patient care related income at the Medical Center. . . .

¶7. The circuit court found that Dr. Ali was, for purposes of these lawsuits, an employee of UMMC and therefore entitled to immunity:

Dr. Ali adduced overwhelming credible evidence that he was, in fact, an employee of the University Medical Center at all times relevant to this matter. Dr. Ali presented the Court with an affidavit of Marjorie Soloman, the Director of Human Resources of the University Medical Center, which stated in no uncertain terms that all treatment allegedly provided to James W. Bennett by Dr. Ali, at all times relevant to this lawsuit, was provided in the course and scope of Dr. Ali's employment with the University Medical Center through the Board of Trustees of State Institutions of Higher Learning. In addition, Dr. Ali presented the Court with a copy of his employment contract which evidences the nature of his relationship with the University Medical Center as an employee of the Hospital and not as an independent contractor. To that end, this Court finds that Dr. Ali is an employee as defined under the MTCA

¶8. We have recently remanded a medical malpractice case for further discovery as to the doctor's employment status. The defendant doctor was an Assistant Professor of Pediatrics at UMMC, as well as a member of two medical practice partnerships. After examining the partnership agreements which limited membership to UMMC faculty members and which referred to each member's "private practice," we found that genuine issues of fact existed as to the employment status of the defendant doctor. *Smith*, 765 So. 2d at 550-51.

¶9. In the instant case, we do not have the benefit of a copy of the partnership agreement between Dr. Ali and University Psychiatric Associates. In *Smith*, we reversed and remanded for further discovery even when the partnership agreement was a part of the record. On the record presented on appeal, a determination of Dr. Ali's relationship to the private patient association cannot be made.

¶10. Furthermore, there is no evidence in the record of the circumstances under which Dr. Ali saw Jake as a patient: as an associate professor for UMMC or as a member of the University Psychiatric Associates. The circuit court relied upon affidavits submitted by UMMC officials. However, the record contains no details of how Jake was billed for Dr. Ali's services and whether the bill included a separate charge for physician services that would go in whole, or in part, directly or indirectly, to Dr. Ali.

¶11. We find that the record is insufficient to support a grant of summary judgment to Dr. Ali and that genuine issues of fact exist. We therefore reverse and remand to the circuit court for further proceedings.

**II. WHETHER THE GRANT OF SUMMARY JUDGMENT TO DR. MADAKASIRA WAS APPROPRIATE.**

¶12. As stated previously, Dr. Ali consulted with Dr. Madakasira on his treatment for Jake, and, because Dr. Ali had not yet obtained a DEA number, Dr. Madakasira wrote certain prescriptions for Jake. There is

no indication in the record whether Dr. Madakasira was a member of a private medical group within UMMC, as was Dr. Ali.

¶13. We have set out a five-part test to follow in determining whether a physician who practices at a public hospital is subject to the MTCA and thereby granted immunity. *Miller v. Meeks*, 762 So. 2d 302 (Miss. 2000). A court is to consider:

> 1. the nature of the function performed by the employee;
>
> 2. the extent of the State's interest and involvement in the function;
>
> 3. the degree of control and direction exercised by the State over the employee;
>
> 4. whether the act complained of involved the use of judgment and discretion;
>
> 5. whether the physician receives compensation, either directly or indirectly, from the patient for professional services rendered.

*Id.* at 310.

¶14. Shortly after adopting the test in *Miller*, we again addressed the issue in *Sullivan v. Washington*, 768 So. 2d 881, 883-86 (Miss. 2000). There, the plaintiff/patient elected to have a tubal ligation. Dr. Sullivan, a resident, was the physician initially scheduled to perform the tubal ligation, and Dr. Meeks was the admitting and attending physician for the surgery. A third physician, however, actually performed the tubal ligation because Dr. Sullivan had been assigned to another part of the hospital at the time of the surgery. At one point in the surgery, Dr. Sullivan came to the surgical suite and assisted for the remainder of the procedure. Over the next few days, the patient developed complications from the surgery, and her conditioned worsened. Dr. Sullivan continued to follow the patient's progress but her condition worsened. Thereafter, the patient brought a medical malpractice action against Dr. Meeks and Dr. Sullivan. Applying the *Miller* five-part test, we held that the physicians were employees of UMMC and were therefore immune from liability pursuant to MTCA.

¶15. The "test focuses on the physician-patient relationship," *Miller*, 762 So. 2d at 310, and though the "determination of whether MTCA applies is fact sensitive," the "question of the applicability of the MTCA is as much a question of law as of fact." *Pickens v. Donaldson*, 748 So. 2d 684, 688-89 (Miss. 1999).

### 1. The Nature of the Function

¶16. In *Sullivan*, the Court found Dr. Meeks's supervisory role in the surgery to be significant because he did not have a private-patient relationship with the patient, but rather, served a public function by providing care for a Medicaid patient. 768 So. 2d at 884. Likewise, Dr. Madakasira argues he held a supervisory role in the psychiatry department at UMMC. When presented with the facts of Bennett's condition, he merely "signed off" on the prescription because Dr. Ali did not have a DEA number. The only reason that he was involved at all, he argues, was because University procedure required a DEA number. Dr. Madakasira avers:

> [W]ithout the opportunity to avail himself of the University procedure of presenting the case to him, as his supervisor, Dr. Ali would not have been able to prescribe medication that required a DEA

number, and therefore would not have been able to carry out his clinical responsibilities as a member of the psychiatric department and UMMC faculty member.

¶17. We find that Dr. Madakasira did not exercise a "supervisory role" over Dr. Ali, who, unlike Dr. Sullivan, had been practicing medicine for years. Although Dr. Madakasira did not render any direct treatment to Jake, his supervision occurred as a part of patient care, not as part of insuring a reputable medical school. As such, his function was more than simply being available to consult with residents; his primary function was related to the treatment of patients. *See Lee v. Bourgeois*, 477 S.E.2d 495, 498 (Va. 1996).

### 2. The Extent of the State's Interest and Involvement in the Function

¶18. We observed in *Sullivan* that the State has a strong interest in maintaining a working hospital along with an educational environment by meeting the needs of both the physicians and the patients. 768 So. 2d at 885. As to the patients, UMMC fulfilled its operational purpose under Miss. Code Ann. § 37-115-31 (1996) by providing care to the patient.[3] The State also has an interest in ensuring that physicians have necessary training so that the State has a ready pool of competent physicians. As a resident, Dr. Sullivan had to practice medicine under the guidance of a learned physician such as Dr. Meeks in order to master his profession.

¶19. Neither Dr. Madakasira nor Dr. Ali was a resident during the relevant time period. Dr. Ali has been licensed in Mississippi since 1994 and in Louisiana since 1989. The State does not have the any interest in one of its faculty members treating a "private patient." As stated previously, there is no mention in the record about whether Dr. Madakasira was associated with a private medical clinic serving patients of UMMC during the relevant period of time. If he is a member of such a group, the private patient clinic is an enterprise designed to allow faculty members to earn additional income and is beyond the scope of duties as a faculty member.

### 3. The Degree of Control and Direction Exercised by the State Over the Employee

¶20. In *Sullivan*, we found that the direction and control of UMMC over Dr. Meeks was significant. He was the staff physician assigned to the operating room to supervise the physicians performing the surgery, and, other than admitting the patient to the hospital and transferring her care according to regulations, Dr. Meeks took no further interest in the patient and was under no duty to do so. *Id.* The fact that Dr. Sullivan was obligated to fulfill his residency requirements showed a certain amount of control exercised by UMMC. Dr. Sullivan, as a resident, had little decision-making power over the course of Washington's treatment." *Id.* Also, importantly, Dr. Meeks and Dr. Sullivan did not choose their patient, and the patient did not choose them.

¶21. Likewise, Dr. Madakasira argues that UMMC had significant control and direction over him. Under the dictates of the university's procedure requiring a DEA number, he was required to sign off on the prescription for Jake's treatment but took no "further interest" in Jake. He did not have a "private patient relationship" with him. He did not choose Jake as a patient, but was only presented with the case with regard to the prescription.

¶22. We take judicial notice of the fact that, as a matter of federal regulation, no physician may prescribe controlled substances without an DEA number, *see* 21 C.F.R. § 1306.03, so any policy promulgated by

UMMC regarding signing off on a prescription would not be dispositive of the issue of whether Dr. Madakasira was supervising Dr. Ali pursuant to UMMC procedures.

### 4. Whether the Act Complained of Involved the Use of Judgment and Discretion

¶23. This factor is counter-intuitive with regard to any medical treatment in general, and psychiatry particularly. A physician must examine and evaluate a patient. Based on the evaluation, the physician will use his judgment and discretion based on his specialized training in deciding what form of treatment is needed and how the treatment is provided. We observed in *Sullivan* that "virtually every act performed by a person involves the exercise of some discretion." *Id*. at 884.

¶24. Dr. Madakasira contends, however, that, just as Dr. Meeks's supervisory acts involved little judgment and discretion, his involvement with Jake and Dr. Ali was limited exclusively to signing off on the prescription. He contends, "Just as Dr. Meeks in the *Sullivan* case was in the operating room to correct the resident if he saw something he was doing incorrectly, Dr. Madakasira reviewed the prescription written by Dr. Ali to make sure Dr. Ali was doing nothing incorrectly." This assertion may be true, but Dr. Madakasira's supervision did not involve merely rubber stamping a DEA number on Jake's prescription. Following a "consultation," the two doctors, in their judgment and discretion, agreed on Jake's medication. It should be noted, however, that the record does not reflect that Dr. Madakasira had any supervisory capacity with respect to Dr. Ali's treatment of private patients.

### 5. Whether the Physician Received Compensation, Either Directly or Indirectly, from the Patient for Professional Services Rendered

¶25. There is no evidence in the record that Dr. Madakasira was ever compensated for his consultation with Dr. Ali. Dr. Madakasira argues his only compensation for "fulfilling his role as a supervisor in the psychiatry department was the salary that he was paid pursuant to his contract with UMMC." Since even Bennett admits that he was not Jake's physician, Dr. Madakasira argues there is no issue as to whether he received compensation from Jake.

¶26. "With no single factor being dispositive," we find that, based on the record before the court and the forgoing analysis, the majority of the factors do not weigh in favor of finding that Dr. Madakasira was acting as an employee of UMMC during the relevant time period. *Sullivan*, 768 So. 2d at 886 n.3. "Contested status issues invariably require discovery. . . . While summary judgment may be appropriate where the status issue has been fully fleshed out and there are no material issues of fact, it cannot be said that the status issue in this case has been fully fleshed out." *Owens v. Thomae*, 759 So. 2d 1117, 1122 (Miss. 1999). Summary judgment was inappropriate.

### III. WHETHER DR. ALI AND DR. MADAKASIRA WAIVED THE PROTECTIONS OF THE MTCA BY FAILING TO PLEAD THE MTCA IN THEIR ANSWERS.

¶27. Neither doctor raised the MTCA as an affirmative defense in their answers, and Bennett argues the trial court erred in permitting the doctors to amend their answers to add the defense. In support of his contention, Bennett cites *Bailey v. Georgia Cotton Goods Co.*, 543 So. 2d 180, 182-83 (Miss. 1989) (affirmative defenses are waived if not properly pled), and *Bell v. First Columbus Nat'l Bank,* 493 So. 2d 964, 968 (Miss. 1986) (affirmative defenses neither pleaded or tried by consent are deemed waived). Though he admits that Miss. R. Civ. P. 15 states amendments should be "freely given when justice so

requires," Bennett maintains that once an answer has been filed and the affirmative defenses have not been set out, they are waived.

¶28. Because Rule 15(b) liberally permits the amendment of pleadings, we find that the trial court did not err in allowing Dr. Ali to amend his answer to include the notice and statute of limitations defenses.

¶29. Dr. Madakasira, on the other hand, raised the defenses for the first time in his motion for summary judgment. Citing a federal application of Mississippi law, *Theunissen v. GSI Group*, 109 F. Supp. 2d 505 (N.D. Miss. 2000), he contends that raising the statute of limitations defense in a motion for summary judgment prior to trial is permitted if sufficient time to respond is given without prejudice. As indicated in Rule 15, the test for determining whether a party has waived an affirmative defense, according to the *Theunissen* court, is whether the defendant's timing resulted in unfair surprise and undue prejudice. In *Beverly v. Powers,* 666 So. 2d 806, 809 (Miss. 1995), we permitted the Department of Human Services to amend its answer to include the sovereign immunity defense after it failed to do so initially. Though two years had passed since the complaint was filed before the DHS raised the defense in a motion for summary judgment, the trial court judge granted the motion noting that it should be no surprise to plaintiff because the DHS had asserted the defense in an early unaddressed motion.

¶30. Bennett argues he was prejudiced by Dr. Madakasira's delay in raising the defense because discovery was complete and he already filed a response to Dr. Ali's motion for summary judgment alleging waiver as a defense. We find that the trial court did not err in allowing Dr. Madakasira to raise the defense. Motions for leave to amend should be liberally allowed. Miss. R. Civ. P. 15(a). We review discretionary determinations by the trial court under an abuse of discretion standard. Unless convinced the trial judge abused his discretion, we are without authority to reverse. *Taylor Mach. Works, Inc. v. Great Am. Surplus Lines Ins. Co.*, 635 So. 2d 1357, 1362 (Miss. 1994). The record indicates that Bennett was given an opportunity to argue against allowing defenses to be asserted on notice and statute of limitations, but we can find no abuse of discretion by the circuit court. This claim is without merit.

### IV. WHETHER INCOMPETENCY BARS APPLICATION OF THE MTCA'S ONE-YEAR STATUTE OF LIMITATIONS.

¶31. If the MTCA applies to this case, the defendants/appellees contend that Bennett's claims are barred by the one-year statute of limitations. In response, Bennett contends that insanity bars application of the MTCA's statute of limitations, as it is unconscionable to require persons who are insane to comply timely with the MTCA. In support, he refers the Court to Annotation, *Mental Incompetency as Obviating Effect of Failure to Comply with Provisions of Workmen's Compensation Act as to Giving Notice or Other Procedural Matters*, 91 A.L.R. 1400 (1926), and to 51 Am. Jur. 2d *Limitations of Actions* §§ 229-34 (2000), but cites no other authority.

¶32. To support their contention that the MTCA applies to incompetents, both Drs. Ali and Madakasira rely upon *Hays v. Lafayette County Sch. Dist.,* 759 So. 2d 1144 (Miss. 1999), and *Marcum v. Hancock County Sch. Dist.,* 741 So. 2d 234, 238 (Miss. 1999), in which we held that the disability of a minor does not toll the statute of limitations under the MTCA. We find that this issue is procedurally barred because Bennett raises it for the first time on appeal. However, because the issue raises important public policy considerations, we will address the merits.

¶33. In *Marcum,* we held that the statute of limitations contained in the MTCA was the exclusive measure

of time to be applied to any claim brought under the MTCA. The minor savings provision contained in a separate chapter of the Code only addressed actions listed in that same chapter.[4] It did not apply to the MTCA.[5] *Id.* The procedural stricture mandated by the MTCA, moreover, is a one-year statute of limitations provision in § 11-46-11, which reads in relevant part:

> (3) All actions brought under the provisions of this chapter shall be commenced within one (1) year next after the date of the tortious, wrongful or otherwise actionable conduct on which the liability phase of the action is based, and not after; provided, however, that the filing of a notice of claim as required by subsection (1) of this section shall serve to toll the statute of limitations for a period of ninety-five (95) days**. The limitations period provided herein shall control and shall be exclusive in all actions subject to and brought under provisions of this chapter, notwithstanding the nature of the claim, the label or other characterization the claimant may use to describe it, or the provisions of any other statute of limitations which would otherwise govern the type of claim or legal theory if it were not subject to or brought under the provisions of this chapter.**

(Emphasis added.) The same analysis applies to persons with disabilities. Though Bennett's argument is not without merit. *See Eubanks v. Clarke,* 434 F. Supp. 1022 (E.D. Pa. 1977) (it is unreasonable to expect involuntary committed mental patients to assert their right while they are institutionalized because it would be unconscionable to allow state employee who violate civil rights of such mental patients under their care to escape federally created liability), our insistence upon strict compliance with the MTCA and the statute of limitations suggests there is no bar to its application here because of Bennett's insanity. *Cole v. State*, 608 So. 2d 1313 (Miss. 1992) (courts will not read exceptions into statute of limitations which applies to persons of mental incompetency or incapacity). *See also Hays*, 759 So. 2d at 1148; *Marcum*, 741 So. 2d at 238. This claim is without merit.

## V. MISCELLANEOUS CLAIMS AGAINST DR. ALI AND DR. MADAKASIRA

¶34. Bennett urges us to extend the holding in *Womble v. Singing River Hosp. Sys.*, 618 So. 2d 1252 (Miss. 1993), a pre-MTCA case. "In *Womble*, this Court overruled then-existing Mississippi law which held that physicians engaged in the public service are qualifiedly immune from suit for medical treatment decisions made during the course of that service." *Sparks v. Kim*, 701 So. 2d 1113, 1115 (Miss. 1997). Acknowledging that in *Barnes v. Singing River Hosp. Sys.*, 733 So. 2d 199 (Miss. 1999), we held that *Womble* does not apply to an interpretation of statutory immunity against a state entity, Bennett argues that unlike the plaintiff in *Barnes*, he did not file suit against UMMC but against the doctors themselves. Clearly, this distinction makes no difference. The argument for application of *Womble* is without merit.

## VI. WHETHER SUMMARY JUDGMENT IN FAVOR OF ELI LILLY AND HOFFMANN-LaROCHE WAS APPROPRIATE.

### A. Negligence and Strict Liability Claims.

¶35. Although a plaintiff in a prescription drug liability case may alternatively rely on strict liability and negligence principles, "these principles merge into one inquiry; the adequacy of the defendant's warnings." *Swayze v. MacNeil Labs., Inc.*, 807 F.2d 464, 467 (5th Cir. 1987); *see also Thomas v. Hoffman-LaRoche, Inc*., 949 F.2d 806, 808 n.1 (5th Cir. 1992) (applying Mississippi law) (negligence and strict liability claims regarding warnings will be considered together).

### 1. Duty to Warn

¶36. Under Mississippi law, as in virtually every jurisdiction in a prescription drug case, a manufacturer of a prescription drug has no duty to warn the patient, consumer, or general public of adverse effects. Under the learned intermediary doctrine, manufacturers do have a duty, however, to adequately warn the treating physician. *See, e.g., **Wyeth Labs., Inc. v. Fortenberry***, 530 So. 2d 688, 691 (Miss. 1988). Thus, it is undisputed that when Bennett was prescribed medication by Dr. Ali, neither Eli Lilly or Hoffmann-LaRoche were required to warn Jake of any risks associated with the medication.

### 2. Adequacy of the Warnings

¶37. An adequate warning is one reasonable under the circumstances and is usually resolved by the trier of fact. ***Id.*** at 692 (citing ***Graham v. Wyeth Labs., Inc***., 666 F. Supp. 1483, 1498 (D. Kan. 1987)). To assist in this determination, courts examine the package inserts which are duplicated in the Physicians Desk Reference pursuant to federal regulations. ***Id.*** Upon review of the package inserts, we concluded in ***Fortenberry*** that it was clear that the patient was in the group for whom the vaccine "was not recommended."***Id***. at 692. The insert warned physicians that although the connection between the medication and the plaintiff's condition was not clear, persons considering the vaccine should be made aware of the benefits and possible risks. ***Id.***

¶38. Eli Lilly and Hoffmann-LaRoche both submitted package insert information from 1994, when Jake took drugs prescribed by Dr. Ali. The package insert for Librium, manufactured by Hoffmann-LaRoche, included the following language:

**PRECAUTIONS**:

In general, the concomitant administration of Librium and other psychotropic agents is not recommended. If such combination therapy seems indicated, careful consideration should be given to the pharmacology of the agents to be employed- particularly when the known potentiating compounds such as the MAO inhibitors and phenothiazines are to be used.

Paradoxical reactions, e.g., excitement, stimulation, and acute rage, have been reported in psychiatric patients and in hyperactive aggressive children, and should be watched for during Librium therapy.

**INDICATIONS**:

Librium is indicated for the management of anxiety disorders for the short-term relief of symptoms of anxiety, withdrawal symptoms of acute alcoholism, and preoperative apprehension and anxiety. Anxiety or tension associated with the stress of everyday life usually does not require treatment with an anxiolytic.

The effectiveness of Librium in long-term use, that is, more than 4 months, has not been assessed by systematic clinical studies. The physician should periodically reassess the usefulness of the drug for the individual patient.

**ADVERSE REACTIONS**

. . . Drowsiness, ataxia and confusion have been reported in some patients-particularly the elderly and

debilitated. . . . Other adverse reactions reported during therapy include isolated instances of skin eruptions, edema, minor menstrual irregularities, nausea and constipation, extrapyramidal symptoms as well as increased as increased and decreased libido.

¶39. The Librax package insert listing, also manufactured by Hoffmann-LaRoche, is nearly identical to that for Librium. Klonopin, the third prescription drug manufactured by Hoffmann-LaRoche, was prescribed for myoclonic jerks, and informs that it should not be used by patients with a history of sensitivity to benzodiazepines, or by patients with clinical or biochemical evidence of significant liver disease. It warns that Klonopin produces CNS depression and side effects in pregnancy and should not be used when engaging in hazardous occupations requiring mental alertness. Lastly, the package insert for Prozac, manufactured by Eli Lilly, which is barely legible in the record, cautions that it causes anxiety, insomnia, seizures, weight loss, etc., and warns of rashes and possible allergic events.

¶40. Bennett submitted adverse drug printouts generated by the United States Food and Drug Administration concerning Prozac, Prozac and Klonopin, and Prozac and Librium. Reactions include dementia, paranoid psychosis, manic reaction, restlessness, hallucinations, hostility, schizophrenic effect, suicide attempts, and injury intent. Bennett contends that, because the FDA reports detailed adverse drug reactions and indicated adverse reactions, individually and in combination, prior to Jake's killing his wife, there is evidence of design defect and failure to warn.

¶41. Eli Lilly and Hoffmann-LaRoche argue that Bennett's strict liability/negligence claims must fail because Dr. Ali testified that he would not have done anything differently had different warnings been given. Specifically, when asked whether he had any criticism of the companies or of the drugs, whether he was familiar with the package inserts, whether he had any criticisms of the warnings contained in the package inserts, and whether there was anything either company could have said or done that would have changed his decision at that time, Dr. Ali responded "no," "yes," "no," and "no," respectively. In granting summary judgment in favor of Eli Lilly, the circuit court's only finding as to the adequacy of the warning was as follows:

> Dr. Ali testified in his deposition that "he was familiar with the Prozac package insert in effect at the time he prescribed Prozac for Jake Bennett and that he has no criticism of the warnings and instructions it contains. Lilly's warning to Dr. Ali is adequate as a matter of law, and Lilly is entitled to summary judgment on plaintiff's negligent failure to warn claim.

¶42. The United States Court of Appeals for the Fifth Circuit, however, has held that, although a doctor testifies that he considers a warning to be adequate, this testimony does not dispose of the question. *Hurley v. Lederele Labs. Div. of Am. Cynamid Co.,* 863 F. 2d 1173, 1178 (5th Cir. 1988). "Although his testimony is competent on the issue, the adequacy of the warning is not a matter that can be conclusively resolved solely on the basis of the administering physician's opinion." *Id.*

¶43. Eli Lilly and Hoffmann-LaRoche make much of the fact that Bennett had been prescribed, without adverse effects, Klonopin, Librium and Librax for several years prior to being treated by Dr. Ali. This argument ignores Bennett's claim that it was the combination of these drugs with Prozac that caused Bennett's violent outburst. Bennett submitted affidavits from two doctors asserting that "to a reasonable degree of medical certainty Prozac, in combination with Librium, Librax and Klonopin, produced a loss of impulse control, rage, with delusions and psychosis leading to the killing of his wife." Dr. Cole testified:

A minimally competent physician would not have prescribed only Prozac or Prozac and Benszodiazopines (such as Klonopin, Librium, and Librax) together if the drug manufacturers Eli Lilly and company and/or Hoffmann-LaRoche, Inc., had medically warned of side effects of uncontrollable anger, violent behavior, delusions, and psychosis. Prozac was and is an extremely dangerous drug and Prozac taken together with Bezodiaphines (such as Klonopin, Librium and Librax) causes patients aggravation and side effects of uncontrollable anger, rage, violent behavior, delusions and psychosis. Eli Lilly and Co. Inc., and Hoffmann-LaRoche , Inc., respectively failed to conduct adequate human studies concerning Prozac only and Prozac and Benzodiazepines taken together (such as Klonopin, Librium and Librax) and their interactions and side effects.

¶44. Similarly, Dr. Sarah Deland testified by affidavit that Eli Lilly and Hoffmann-LaRoche, "failed to adequately disclose in 1994 the side effects of Prozac; and Librium, Librax and Klonopin when taken together with Prozac."

That within a reasonable degree of medical certainty, that in this case, Prozac did cause or contributed to causing psychosis, paranoid ideation, confusion, akathisia agitation, suicidal ideation, antisocial behavior, and violent reactions in Jake Bennett resulting in the death of his wife Jo Bennett. . . . The warnings in the 1994 Physicians Desk Reference were inadequate because medical articles prior to 1994 showed violent reactions and suicide tendencies in some patients to Prozac.

¶45. The only evidence supporting the drug companies' contentions to the contrary are the package inserts in the record, which have no accompanying explanations.

¶46. Because Dr. Ali's testimony regarding the adequacy of the warnings was, as a matter of law, not conclusive of the issue, and because Bennett produced evidence that the warnings were not adequate, we find that the circuit court erred in granting summary judgment on the adequacy of the warnings issue.

### 3. Causation

¶47. The Fifth Circuit, applying Mississippi law, has said plaintiffs must establish, by the preponderance of the evidence, both: (1) that an adequate warning would have prevented the treating physician from administering the drug; and (2) that the injury would not have occurred had the drug not been administered. *Thomas,* 949 F.2d at 814. To satisfy this burden of proving causation, "a plaintiff may introduce either objective evidence of how a reasonable physician would have responded to an adequate warning, *or* subjective evidence to establish how the treating physician would have responded." *Id*.

¶48. Again, Eli Lilly and Hoffmann-LaRoche argue that Bennett fails to show that Dr. Ali would have acted differently. This is a compelling argument because it suggests no proximate cause exists between the manufacturers' failure to warn and Bennett's reactions to the prescription drugs. *Odom v. G.D. Searle & Co.,* 979 F.2d 1001, 1003-04 (4th Cir. 1992) (summary judgment appropriate where physician testified a different warning, one advising physicians not to prescribe an intrauterine device to women who might later want children, would not have changed his decision to prescribe the device); *Willett v. Baxter Intern., Inc.,* 929 F.2d 1094, 1098-99 (5th Cir. 1991) (alleged failure to warn of less than one percent increase in the risks associated with heart valve replacement was not the proximate cause of plaintiff's fear of future heart valve failure where the only reasonable conclusion is that an adequate warning would not have affected the physician's decision to proceed with the surgery); *Kirsch v. Picker Intern., Inc*., 753 F.2d 670, 671-73 (8th Cir. 1985) (manufacturer's failure to warn of potential risks associated with radiation

therapy for the treatment of acne was not the proximate cause of plaintiff's injuries where treating physician was aware of the risks).

¶49. The weight to be afforded such affidavit or testimony, however, depends on the substance of the evidence as well as the credibility and reliability of the treating physician himself. *Woulfe v. Eli Lilly & Co.,* 965 F. Supp. 1478 (E.D. Okla. 1997). Though Eli Lilly and Hoffmann-LaRoche contend the affidavits from Bennett's experts cannot create a genuine issue of material fact in the face of Dr. Ali's undisputed and "unequivocal testimony," Bennett, relying upon the objective standard for proving warning causation, directs the court to his expert doctors' testimony that a minimally competent physician would have acted differently towards an adequate warning. *Grenier v. Medical Eng'g Corp.*, 243 F.3d 200 (5th Cir. 2001) (citing *Thomas*) (applying Louisiana law) (the evidence of what the affiant personally would have done cannot suffice to prove causation under the learned intermediary doctrine, as a plaintiff, in order to show causation, may introduce either objective evidence of how a reasonable physician would have responded to an adequate warning, or subjective evidence of how the treating physician would have responded).

¶50. Because Dr. Ali's testimony that he would not have done anything differently had other warnings been given is subject to a credibility determination, we find that the circuit court erred in granting summary judgment on causation.

### B. Breach of Implied Warranty of Merchantability and Implied Warranty of Fitness for a Particular Purpose.

¶51. The Mississippi Products Liability Act ("the MPLA") provides that a manufacturer may be held liable when the product breaches an express warranty or fails to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product. Miss. Code Ann. § 11-1-63(a)(i)(4) (Supp. 2001). Bennett argues that Eli Lilly and Hoffmann-LaRoche both breached implied warranties of merchantability and fitness for a particular purpose. Eli Lilly and Hoffmann-LaRoche insist, however, that Bennett's implied warranties claims are without merit because the MPLA contains no provision for recovery based on breach of an implied warranty, *see* Miss. Code Ann. § 11-1-63 (Supp. 2001), only express warranties.

¶52. A United States District Court applying Mississippi law has held, however, that though the MPLA creates a cause of action in tort for breach of express warranty, it does not preclude the breach of implied warranty claims under the Mississippi Uniform Commercial Code in products liability actions. Miss. Code Ann. § 75-2-715. *In re Rezulin Prods. Liab. Litig.,* 133 F. Supp. 2d 272, 279 n.3 (S.D.N.Y. 2001) (citing *Childs v. General Motors Corp.,* 73 F. Supp. 2d 672 (N.D. Miss. 1999)). In other words, the MPLA does not abrogate a statutory cause of action for breach of implied warranty as grounds for recovery. Miss. Code Ann. §§ 11-1-63, 75-2-715. Generally speaking, "a new statute will not be considered reversing long-established principles of law and equity unless the legislative intention to do so clearly appears." *Thorp Comm. Corp. v. Miss. Road Supply Co.*, 348 So. 2d 1016, 1018 (Miss. 1977). *Accord*, *Taylor v. General Motors Corp.*, 1996 WL 671648, at *2 (N.D. Miss. 1996). In *Taylor*, as well as in the case at bar, the manufacturer relied only on the first sentence of the Act to support their argument that a breach of implied warranty claims are not recognized by the Act. If the Legislature had intended to restrict an implied warranty claim, it would have done so. *Id.* at 672.

¶53. We find, therefore, that the circuit court erred in finding Bennett was precluded from maintaining a breach of implied warranty cause of action.

¶54. Worth noting, however, is the fact that Bennett makes no supporting argument in support of his breach of implied warranty claims. One court has held, however, that inadequate warnings alone can constitute a product defect, whether the theory be implied warranty or strict liability in tort. ***Smith v. E.R. Squibb & Sons, Inc.,*** 273 N.W.2d 476 (Mich. 1979). Further, though we have held that a breach of warranty theory cannot be submitted to the jury without both proof of a defect and proof that such defect caused the injury, ***Crocker v. Sears***, ***Roebuck & Co.***, 346 So. 2d 921 (Miss. 1977), we have previously found that a genuine issue of material fact exists as to causation.

¶55. Eli Lilly and Hoffmann-LaRoche argue that under the learned intermediary doctrine, Kevin cannot recover for any alleged implied representations purportedly relied on by Jake. They contend that their duty under the learned intermediary doctrine is based on the information they provide the prescribing physician, not the patient. They do not, however, cite any authority for this proposition. Though the learned intermediary doctrine has been applied to a breach of implied warranty case, ***Talley v. Danek Med., Inc.,*** 7 F. Supp. 2d 725 (E.D. Va. 1998), *aff'd*, 179 F.3d 154 (4th Cir. 1999), the learned intermediary doctrine relates only to the issue of whom the manufacturer warned. It does not govern the adequacy of the warning. ***Hurley,*** 863 F.2d at 1178.

¶56. Bennett alleged design defect claims and though he does not raise this as an issue on appeal, both Eli Lilly and Hoffmann-LaRoche address the issue. The circuit court dismissed this claim based on our adoption of Restatement (Second) of Torts, § 402, cmt. K. ***State Stove Mfg. Co. v. Hodges***, 189 So. 2d 113, 118 (Miss. 1966). Comment K to § 402 A shields "unavoidably unsafe" products, such as prescription drugs, from strict liability and provides in pertinent part:

> *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. . . . Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. . . . The seller of such products . . . is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attending with a known but apparently reasonable risk.

¶57. The circuit court found that the drugs were "unavoidably unsafe products" within the meaning of Comment K, and that Comment K, as a matter of law, bars Bennett's strict liability design defect claim. The Fifth Circuit has stated, however, that, under Comment K, liability would be imposed only when the drug is not "properly prepared, properly marketed, or **accompanied by proper warnings**." *Swayze,* 807 F.2d at 468 (applying Mississippi law) (emphasis added). Comment K, further, is an affirmative defense. ***Freeman v. Hoffman-LaRoche, Inc.,*** 618 N.W.2d 827 (Neb. 2000). It does not provide a blanket immunity from strict liability for prescription drugs, *id.,* as not all prescription drugs are "unavoidably unsafe." ***Feldman v. Lederle Labs.,*** 479 A.2d 374 (N.J. 1984). Though Comment K has been interpreted in a variety of ways in other jurisdictions, and there has been a wide range of disagreement regarding its application, *id*., we find that the circuit court erred in this finding.

¶58. We find that the circuit court erred in granting summary judgment on the issue of breach of implied warranties.

## CONCLUSION

¶59. For the foregoing reasons, the grants of summary judgment to Sudhakar Madakasira, M. D., Jeffery A. Ali, M. D., Eli Lilly and Company and Hoffmann-LaRoche, Inc., are reversed, and these cases are remanded to the Circuit Court of the First Judicial District of Hinds County, Mississippi, for further proceedings consistent with this opinion.

¶60. **REVERSED AND REMANDED.**

**PITTMAN, C.J., DIAZ, EASLEY, CARLSON, AND GRAVES, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY, J. COBB, J., JOINS IN PART. SMITH, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY COBB, J.**

**McRAE, PRESIDING JUSTICE, CONCURRING IN RESULT:**

¶61. I agree with the results reached by reversing and remanding these four cases which were consolidated for this appeal. However, I disagree with the majority's academic gymnastics to apply the *Miller* test to Dr. Madakasira. *See Miller v. Meeks*, 762 So. 2d 302, 310 (Miss. 2000). The majority has established, and I agree, that Dr. Madakasira was not acting in a supervisory capacity. In violation of federal laws and the laws of this State, Dr. Madakasira prescribed medicine when he had no doctor-patient relationship with Bennett. This action was contrary to the license to practice medicine issued to him by the State of Mississippi as well as the federal license for prescribing medicine.

¶62. The majority says the test to focus on is the physician-patient relationship and cites *Miller*, 762 So.2d at 310. While that is true, Bennett was not Dr. Madakasira's patient and Dr. Madakasira was not acting in a supervisory role over Dr. Ali. Therefore, this test does not apply here. Dr. Madakasira violated the laws by prescribing medication contrary to his license. He may as well get on the internet and send out medicine to anybody who requests it. Dr. Madakasira flunks the test, as there is no test to be applied to him since he was not in a physician-patient relationship or acting in a supervisory capacity.

¶63. Under Miss. Code Ann. §§ 11-46-5 & -7(2) (Supp. 2001), there is no immunity for a physician employed by the state when he violates the laws in a gross or reckless manner. In this case, Dr. Madakasira did so by prescribing medicine to a patient that he never saw and with whom he did not have a patient-physician relationship. He further violated the law by prescribing medicine in violation of his license afforded him by the State of Mississippi and in violation of federal regulations prohibiting physicians from prescribing controlled substances without a DEA number. Dr. Ali did not have a DEA number to prescribe medication in Mississippi.

¶64. Additionally, I disagree with the majority as it applies and interprets Miss. R. Civ. P. 15 to mean that the trial court should allow the doctors liberal leave to amend their answers to add affirmative defenses. The trial court allowed Dr. Madakasira to raise Mississippi Tort Claims Act (MTCA) defenses for the first time in his motion for summary judgment. We take the matter on a de novo basis in reviewing a grant of summary judgment. Yet, the majority does not allow Bennett to raise the insanity defense by stating that he is procedurally barred from doing so. Bennett argues that it is unconscionable to require persons who are insane to comply timely with the MTCA. If the majority is to allow the defendants at the time of summary judgment, for the first time, to raise the MTCA and not plead it affirmatively then the incompetency issue should also be allowed, particularly in view of the fact that we review summary judgments de novo. I would

so hold that the insanity portion of the statute of limitations does not apply because Bennett was declared to be insane and was being treated by the State of Mississippi for that diagnosis.

¶65. Finally, as to the issues involving Eli-Lilly and Hoffmann-LaRoche, I part company with the majority where it says that a plaintiff in a prescription drug liability case may alternatively rely on strict liability and negligence principles and that these principles merge into one, the adequacy of the defendant's warning. It mattered not to Dr. Ali or Dr. Madakasira whether Eli-Lilly and Hoffmann-LaRoche had a duty to adequately warn the treating physicians. Here, neither physician had the proper capacity to treat Bennett. Dr. Ali had no prescription license, and Dr. Madakasira had a license but did not have the necessary patient-physician relationship with Bennett. Therefore, neither doctor could legally prescribe medication to Bennett. Yet, they did so anyway. Further, Dr. Ali did not have the required DEA number to prescribe drugs even though, the majority makes a compelling argument that Bennett failed to show that Dr. Ali would have acted differently.

¶66. For these reasons, I concur only in the result.

**EASLEY, J., JOINS THIS OPINION; COBB, J., JOINS IN PART.**

**SMITH, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶67. I agree with the majority that summary judgment in favor of Eli Lilly and Hoffmann-LaRoche was inappropriate. However, in my view, the trial court did not err in granting summary judgment in favor of Drs. Ali and Madakasira. The majority concludes that the record is inconclusive on the physicians' employment status and that summary judgment was therefore inappropriate. I respectfully disagree. The record is totally dev oid of any evidence that at the time they treated Bennett, the physicians were acting outside the line and scope of their employment with UMMC.

¶68. Miss. Code Ann. § 11-46-5(3)(Supp. 2001) provides:

> For the purposes of this chapter and not otherwise, it shall be a rebuttable presumption that any act or omission of an employee within the time and at the place of his employment is within the course and scope of his employment.

¶69. Bennett has offered absolutely no evidence to rebut this statutory presumption. Even in the absence of the statutory presumption, all evidence in the record indicates that the physicians were acting as employees of UMMC at all times pertinent. The evidence in the record regarding employment status is as follows:

> 1. Affidavits of Marjorie Solomon stating unequivocally that the duties of both physicians involve the treatment of patients at UMMC and that all treatment provided to Bennett occurred in the physicians' course and scope of their employment with UMMC.

> 2. Employment contracts of both physicians stating that they are employees of UMMC.

> 3. Insurance policies held by the physicians.

¶70. This Court has held that a physician's professional liability policy does not waive his/her claim to immunity under the MTCA. *Knight v. McKee*, 781 So. 2d 121, 123 (Miss. 2001). The insurance policies

are the only evidence which Bennett asserts supports his claim that the physicians were acting outside the scope of their employment with UMMC. The fact that Dr. Ali's policy states that it was purchased by the private practice group does not, in and of itself, create a question of fact regarding his employment status at the time he treated Bennett. Furthermore, nothing in the record connects Dr. Madakasira to the private practice group.

¶71. In *Smith v. Braden*, 765 So. 2d 546 (Miss. 2000), relied upon by the majority, this Court concluded that there was insufficient evidence in the record to enable this Court to determine whether Dr. Braden was acting outside the scope of his employment with UMMC at the time he treated the decedent. This Court's decision to remand for further discovery in that case was predicated upon its finding that there was evidence in the record which raised an issue of fact as to Dr. Braden's employment status and, therefore, that summary judgment was improper. The case at bar is clearly distinguishable. There is absolutely no evidence in the record which raises an issue of fact as to the physicians' employment status at the time they treated Bennett. Furthermore, this Court in *Smith* explained that where an issue brought before the court for summary judgment has not been fully fleshed out, the "party resisting summary judgment must present specific facts why he cannot oppose the motion and must specifically demonstrate 'how postponement of ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" *Id.* at 554 (quoting *Owens v. Thomae*, 759 So. 2d 1117, 1120 (Miss.1999)). At no point did Bennett request a continuance or argue the need for further discovery regarding the employment status of the physicians.

¶72. Because the record is devoid of evidence which raises an issue of fact as to the physicians' employment status at the time they treated Bennett, I would affirm the trial court's grant of summary judgment in favor of Drs. Ali and Madakasira.

   **COBB, J., JOINS IN PART.**

1. Kevin's brother Gerald has since been substituted as conservator.

2. Miss. Code Ann. § 11-46-1(f) (Supp. 2001) provides as follows:

   "Employee" means any officer, employee or servant of the State of Mississippi or a political subdivision of the state, including elected or appointed officials and persons acting on behalf of the state or a political subdivision in any official capacity, temporarily or permanently, in the service of the state or a political subdivision whether with or without compensation. The term "employee" shall not mean a person or other legal entity while acting in the capacity of an independent contractor under contract to the state or a political subdivision; provided, however, that for purposes of the limits of liability provided for in Section 11-46-15, the term "employee" shall include physicians under contract to provide health services with the State Board of Health, the State Board of Mental Health or any county or municipal jail facility while rendering services under such contract.

3. This section provides that "there shall be a reasonable volume of free work; however, said volume shall never be less than one-half of its bed capacity for . . . qualified beneficiaries of the State Medicaid Program."

4. The savings clause in Miss. Code Ann. § 15-1-59(1) (1995) reads as follows:

   If any person entitled to bring any of the personal actions mentioned shall, at the time at which the

cause of action accrued, be under the disability of infancy or unsoundness of mind, he may bring the action within the times in infancy or unsoundness of mind, he may bring the actions within the times in this chapter respectively limited, after his disability shall be removed as provided by law. However, the saving in favor of persons under disability of unsoundness of mind shall never extend longer than twenty-one (21) years.

5. The Legislature has amended § 11-46-11 as follows:

(4) From and after May 15, 2000, if any person entitled to bring any action under this chapter shall, at the time of which the cause of action accrued, be under the disability of infancy or unsoundness of mind, he may bring the action within the time allowed in this section after his disability shall be removed as provided by law. The savings in favor of persons under disability or unsoundness of mind shall never extend longer than twenty-one (21) years.

This amendment does not apply to Bennett's cause of action because the claims accrued prior to May 15, 2000.