# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-00102-SCT

*DEDEAUX UTILITY COMPANY, INC.*

*v.*

*THE CITY OF GULFPORT, MISSISSIPPI,*
*A MUNICIPAL CORPORATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/13/2004 |
| TRIAL JUDGE: | HON. T. LARRY WILSON |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY SPECIAL COURT OF EMINENT DOMAIN |
| ATTORNEYS FOR APPELLANT: | JAMES H. HERRING |
| | J. REILLY MORSE |
| ATTORNEY FOR APPELLEE: | GARY WHITE |
| NATURE OF THE CASE: | CIVIL - EMINENT DOMAIN |
| DISPOSITION: | ON DIRECT AND CROSS-APPEAL: REVERSED AND REMANDED - 09/28/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE SMITH, C.J., WALLER, P.J., AND RANDOLPH, J.

### WALLER, PRESIDING JUSTICE, FOR THE COURT:

¶1.     Dedeaux Utility Company, Inc., is the holder of certificates of public convenience and necessity for certain water and sewer services in Harrison County, Mississippi.   Eight years after the City of Gulfport filed a petition for condemnation against Dedeaux, the matter went to trial in the Harrison County Special Court of Eminent Domain before a jury.   Dedeaux's expert valued the utility plant at $9,025,500.00, and Gulfport's expert valued the utility plant at $2,140,000.00.   The jury returned a verdict for $3,634,757.00, and a judgment was entered

in accordance with that verdict. Dedeaux appeals, and Gulfport has filed a cross-appeal. Finding that the trial court erred, we reverse its judgment and remand this case for a new trial.

## FACTS

¶2.    In 1996, the City of Gulfport filed two separate petitions for condemnation: one against Orange Grove Utilities, Inc., and one against Dedeaux Utility Company, Inc.  These two utility districts were privately owned and operated and were located on and served sites outside the Gulfport city limits, but annexations made by Gulfport in 1991 had made the utility plants and their customers a part of the city.   Under Miss. Code Ann. § 77-3-17 (Rev. 2000),[1] Gulfport had the right to condemn such utility districts and incorporate them into its municipal system.

¶3.    After Gulfport filed its petition against Orange Grove, the two parties agreed to acquire one appraisal – made by a mutually agreeable appraiser – to determine just compensation.  As a result, Gulfport agreed to pay Orange Grove $33,800,000.

¶4.    Dedeaux refused Gulfport's offer of $2,140,000, and the matter went to trial before a jury which awarded Dedeaux $3,634,757.00.

## DISCUSSION

### Dedeaux's Direct Appeal

### I.    CONTRIBUTIONS IN AID OF CONSTRUCTION.

¶5.    Approximately 50% of Dedeaux's physical assets were contributed to Dedeaux by land developers, called "contributions in aid of construction."   These assets include pipelines installed by and paid for by the developers under their projects.   When the pipelines were

---

[1]Section 77-3-17 provides in part that "[a]ny municipality shall have the right to acquire by purchase, negotiation or condemnation the facilities of any utility that is now or may hereafter be located within the corporate limits of such municipality; . . . ."

connected to the Dedeaux plant, the title to the pipelines were transferred to Dedeaux. Therefore, Dedeaux never paid any consideration for the contributed assets. Other contributions in aid of construction included easements, rights-of-way, wells, lift stations and tank sites.

¶6.    Gulfport's only expert witness who testified as to Dedeaux's value was James M. Stokes, a certified public accountant and a certified valuation analyst; however he had never before determined the value of a utility system. Stokes testified that he used the "discounted cash flow method," which is a method of calculating the value of an income stream. He used data from the Public Service Commission to determine Dedeaux's income. The Public Service Commission establishes rate bases for all public utilities in the state. In fixing the rate bases, the Public Service Commission considers the following data:

> (a) the reasonable original costs of the property used and useful, or to be used and useful within a reasonable time after the test period; (b) the portion of the cost which has been consumed by previous use recovered by depreciation expense; (c) the allowance for funds used during construction, . . . and, on the equity component thereof, a rate of return granted on common equity . . . ; (d) any other elements deemed by the commission to be material in determining the rate base for rate-making purposes.

Miss. Code Ann. § 77-3-43(1) (Rev. 2000). "Rates prescribed by the [Public Service Commission] shall be such as to yield a fair rate of return to the utility furnishing service, upon the reasonable value of the property of the utility used or useful in furnishing service." Miss. Code Ann. § 77-3-33(1) (Rev. 2000). Finally, "[t]he rate base shall not include property donated to such utility without any consideration nor shall operating expenses include depreciation of such donated property." Miss. Code Ann. § 77-3-43(2) (Rev. 2000).

3

Therefore, under our statutory scheme, a public utility's rate base is determined by calculating a fair rate of return on the reasonable value of the public utility's assets. However, contributed property is not counted as one of the public utility's assets; therefore, the rate of return fixed by the Public Service Commission excludes consideration of the value of contributed property.

¶7. Stokes testified that he based his valuation on the revenue being generated by the entire system, including contributed property and purchased property, but, since he also testified that he used data from the Public Service Commission as his sole source of information, his calculations did not take into consideration contributed property because, as set out above, the Public Service Commission does not consider contributed property. When Stokes testified that, in making his calculations, he only used data generated by the Public Service Commission, Dedeaux asked the trial court to exclude all of Stokes's testimony. It argued that, since, under § 77-3-43(2), contributed property is not taken into account by the Public Service Commission when establishing rates for various utilities, no data from the Public Service Commission would be reliable. Dedeaux argues that, since some of its valuable assets were excluded in the Public Service Commission rate decisions, any appraisal based on Public Service Commission data would be too low.

¶8. A leading treatise on eminent domain states, "'Contributed property' *must be* included in the plant value even though such items are disregarded for purposes of rate-regulation." Julius L. Sackman, *Nichols on Eminent Domain* § 15.07, at 15-48 (3d ed. rev. 2000) (emphasis added). Sackman points out the distinction between valuation of a utility in rate-making cases and in condemnation cases: "when determining value in condemnation matters, greater weight seems to have been placed upon the fact of cost of reproduction, while in the

4

rate-making cases, original cost is given predominant consideration." *Id.* § 15.06[2], at 15-46 (footnotes omitted). Further,

> [e]ven though such physical additions [i.e., contributions in aid of construction] to the plant are typically deeded over to the utility, and add value to the plant, they are not added to the rate base and thus do not generate additional rate charges. the modern theory of rate setting requires not "market" or "fair" value, but rather, a "fair return to the investors." As such, contributions from customers are not direct investments of the utility owner, and are therefore excluded from rate base.

> Note here that the property excluded from rate base (but which must be included in fair value) may be significant: fully depreciated machinery still functioning and useful; valuable assets, which have been depreciated on the books, but which may have appreciated in market value; and large amounts of contributed infrastructure owned and used by the utility owner, but not included in rate base. *The importance of this point is that a utility valuation by whatever approach, premised on a regulatory rate base that excludes significant utility assets, almost without exception results in less than full or just compensation for all property taken.*

*Id.* § 15.6[1], at 15-40 (footnotes omitted) (emphasis added).

¶9.     Several courts have decided that data from state regulatory agencies are not reliable as proof of value of utility systems for eminent domain purposes. In ***Puget Sound Power & Light Co. v. City of Puyallup***, 51 F.2d 688, 690 (9th Cir. 1931), the Ninth Circuit stated that "the problem presented in a condemnation proceeding is essentially different from that presented to a rate-making body" because, in condemnation proceedings, the issue is "just compensation, which means "the market value of the property taken." However, "the nature and character of the evidence to be considered by the ratemaking body . . . ignores certain elements of value which go to make up a fair value of the property." In ***Onondaga County Water***

5

***Authority v. New York Water Service Corp.***, 139 N.Y.S.2d 755, 768 (N.Y. App. Div. 1955), the court stated, "The complete lack of similarity between the original cost used in rate-making and the "just compensation" for the purpose of taking needs no comment."

¶10. The Florida Supreme Court has held that, "[s]ince regulated earnings place no value on contributed property, it follows that capitalization of *regulated* earnings is unacceptable as a method of valuing appellees' property in this proceeding." ***Dade County v. Gen. Waterworks Corp.***, 267 So. 2d 633, 641 (Fla. 1972) (emphasis in original).

¶11. More recently, the Maine Supreme Judicial Court held, "The original source of the funds for construction of the Lakehause line [i.e., contributed funds in aid of construction] does not prevent the inclusion of the line in the valuation of the Water Company when the line was Water Company property under the law." ***Rangeley Water Co. v. Rangeley Water Dist.***, 691 A.2d 171, 178 (Maine 1997). And, finally, in ***Washington Suburban Sanitary Comm'n v. Utilities, Inc., of Maryland***, 775 A.2d 1178, 1194 (Md. 2001), the Maryland Court of Appeals found that a statute mandating that appraisals for eminent domain purposes would not include contributions in aid of construction was unconstitutional.

¶12. We find that the trial court erred when it denied Dedeaux's motion to strike Stokes's testimony because his entire appraisal was based on data based on rates fixed by the Public Service Commission. Rule 702 of the Mississippi Rules of Evidence provides that expert testimony is admissible if: (1) the testimony will assist the trier of fact; (2) the witness is qualified as an expert; (3) the testimony is based upon sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the witness has applied the principles and methods reliably to the facts of the case. In ***Mississippi Transportation***

6

***Comm'n v. McLemore***, 863 So. 2d 31 (Miss. 2003), we held that, to be admissible, expert testimony must be both relevant and reliable.[2]  ***Id.*** at 38.  Stokes's testimony was not based on sufficient facts and data and was therefore unreliable.   Therefore, the trial court erred in admitting that testimony.

## II.     APPRAISALS OF FOUR PARCELS OF LAND.

¶13.     Dedeaux called two expert witnesses to testify as to the plant's value.   After the first expert testified, Dedeaux proffered the testimony of William Allen Purvis, who had appraised only four parcels of land which were part of the plant.   Improvements such as the installation of a water tower had been made to the parcels, but Purvis appraised only the value of the land without improvements.    Gulfport objected, claiming that evidence of the values of individual assets are not relevant to determining the value of an on-going business; the trial court agreed and did not allow Purvis to testify.

¶14.     Sackman states that the current value of property is an element in determining the value of a utility when it is being condemned by a governmental entity:

> When the plant of a public service corporation is taken by eminent domain, the corporation is not limited to the value of its physical property, or to the cost of reproducing the same, but it is entitled to be paid for the value of its property and franchises taken together as a going concern and as parts of one working system.  In reaching that value there are a number of tests, no one of which is conclusive, but each of which sheds some light upon the subject of the investigation.   The elements ordinarily considered in ascertaining the value of the utility are the current

---

[2]Our standard is based on the United States Supreme Court's rulings in ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).  ***McLemore***, 863 So. 2d at 35, 39.

> value of the tangible property of the company, the earnings, both present and future, of the company, the "going value" of the plant, and the amount of money required to put the plant in good condition.

Sackman, § 15.07, at 15-48 (footnotes omitted). Sackman goes on to list other factors to be considered: earnings, *id*. at § 15.07[1]; cost of construction, *id*. at § 15.07[2]; reproduction costs, *id*. at § 15.07[3]; capital stock, *id*. at § 15.07[4]; and intangible property, *id*. at § 15.10. Finally, Sackman emphasizes the fact that, since all of these different factors must be considered, different methods of appraisals must be used and one method of appraisal will not be reliable for evaluating all of the different facts.

¶15. All elements of property should be considered in arriving at the valuation of a utility:

> We hold that the measure of damages . . . is the difference between the fair market value of the business as a going concern immediately before the damage and the fair market value of any assets remaining after the business closed and ceased as a public utility. In determining the before value of the utility business so damaged, *every element of the plan or system which was reasonably required for the operation thereof and which entered into and remained a part thereof should be taken into account*. . . . The value of the utility as a going concern is obtained by taking a comprehensive view of each and all of the elements of property, tangible and intangible, and considering them as inseparable parts of the business entity.

*City of Jackson v. Creston Hills, Inc.*, 252 Miss. 564, 172 So. 2d 215, 221-22 (1965) (cited with approval in *Bear Creek Water Ass'n v. Town of Madison*, 416 So. 2d 399, 401-02 (Miss. 1982)) (emphasis added). Therefore, the value of the land upon which the utility plant was constructed should be considered as just one of the factors in determining just compensation.

¶16. We find that the trial court erred when it did not allow Dedeaux to put on proof of valuation of the four parcels of land without improvements.

8

### III. HIGHEST AND BEST USE.

¶17. In eminent domain cases, the highest and best use of the subject property is a factor to be considered in determining what just compensation should be:

> The rule is well settled that the present value of land sought to be condemned in eminent domain proceedings is not to be estimated simply with reference to the condition in which the owner has maintained it or for the use to which it is at the time applied, but with reference to any use to which it is reasonably adapted. The best or most valuable use to which the property, which is taken for the public use, is adapted should be considered.

*Miss. State Hwy. Comm'n v. Brooks*, 239 Miss. 308, 316-17, 123 So. 2d 423, 427 (1960).

Mississippi courts routinely consider highest and best use in eminent domain cases: *Tunica County v. Matthews*, 926 So. 2d 209 (Miss. 2006); *Miss. Transp. Comm'n v. Nat'l Bank of Commerce*, 708 So. 2d 1 (Miss. 1997); *Miss. Transp. Comm'n v. Fires*, 693 So. 2d 917 (Miss. 1997); *Oughton v. Gaddis*, 683 So. 2d 390 (Miss. 1996); *Morley v. Jackson Redev. Auth.*, 632 So. 2d 1284 (Miss. 1994); *Potters v. State Hwy. Comm'n*, 608 So. 2d 1227 (Miss. 1992); *Howell v. State Hwy. Comm'n*, 573 So. 2d 754 (Miss. 1990); *Dykes v. State Hwy. Comm'n*, 535 So. 2d 1349 (Miss. 1988); *Hudspeth v. State Hwy. Comm'n*, 534 So. 2d 210 (Miss. 1988); *Miss. State Hwy. Comm'n v. Vivarette*, 529 So. 2d 896 (Miss. 1988); *State Hwy. Comm'n v. Havard*, 508 So. 2d 1099 (Miss. 1987); *Tenn. Gas Pipeline Co. v. Amos*, 497 So. 2d 438 (Miss. 1986); *Miss. State Hwy. Comm'n v. Franklin County Timber Co.*, 488 So. 2d 782 (Miss. 1986); *Ellis v. Miss. State Hwy. Comm'n*, 487 So. 2d 1339 (Miss. 1986); *Miss. State Hwy Comm'n v. Antioch Baptist Church, Inc.*, 392 So. 2d 512 (Miss. 1981).

¶18. Dedeaux argues that Gulfport's evidence of highest and best use was unreliable because it assumed that the plant's highest and best use was as a regulated utility. Until Gulfport assumed the operation of the plant, Dedeaux operated as a "for profit"[3] utility which, under Miss. Code Ann. § 77-3-2 (Rev. 2000), is regulated by the Public Service Commission. A governmental entity which owns and operates a utility is not regulated by the Public Service Commission, *see* Miss. Code Ann. § 77-3-1 (Rev. 2000). Dedeaux argues that the plant's highest and best use was as a non-regulated utility because it would not be under the control of the Public Service Commission.

¶19. If reliable evidence shows that regulation diminishes the value of a utility, the jury should consider an opinion that the utility's highest and best use would be as a non-regulated utility. *Ventures Northwest Ltd. P'ship v. State*, 914 P.2d 1180, 1189 (Wash. Ct. App. 1996). The converse is also true: if reliable evidence shows that regulation increases the value of a utility, the jury should consider an opinion that the utility's highest and best use would be as a regulated utility. The determination of the utility's highest and best use should be based on expert testimony offered under M.R.E. 702.

### IV. GULFPORT'S REMARKS ON POSSIBLE TAX INCREASES.

¶20. Dedeaux complains about remarks by Gulfport's counsel which implied that, the higher the award, the higher taxes will be. Dedeaux did not object to these remarks at trial and is therefore barred from appellate review. *Nunnally v. R.J. Reynolds Tobacco Co.*, 869 So. 2d 373, 378 (Miss. 2004).

---

[3]Utilities owned by governmental entities are not "for profit" utilities.

10

## V.    EQUAL PROTECTION.

¶21.    Dedeaux claims that its right to equal protection of the laws under the United States and Mississippi Constitutions (U.S. Const. amend. XIV; Article 3, Section 17 of the Mississippi Constitution of 1890) was violated because, while Gulfport settled its eminent domain claims against Orange Grove, a utility which was similarly situated, it did not offer Dedeaux similar terms.    Gulfport paid Orange Grove $33,800,000 ($3,157.40 per customer for 10,705 customers) for its property and offered Dedeaux only $2,140,000 ($773.63 per customer for 2,763 customers).    Also, Dedeaux claims that, since Gulfport and Orange Grove agreed on one appraiser and to abide by his or her recommendations, Gulfport should have entered into the same type of agreement with Dedeaux.    Dedeaux points to the testimony of a Gulfport Alderman which indicated that the disparity of treatment between Dedeaux and Orange Grove was based on political reasons, *i.e.*, spending as much money on Dedeaux as they spent on Orange Grove would have lessened city officials' chances of being re-elected.

¶22.    The trial court never ruled on the equal protection claim.[4]    Instead, it ruled on the admissibility of evidence pertaining to the Orange Grove settlement.    An appellate court cannot review a matter which was not ruled upon by the trial court. *Hemmingway v. State*, 483 So. 2d 1335, 1337 (Miss. 1986) (where a trial court does not rule, there is nothing preserved for review by an appellate court) (citing *Marr v. State*, 248 Miss. 281, 159 So. 2d 167 (1963)). Therefore, we do not address this claim.

---

[4]The trial court stated, "I do not choose to go down that road," i.e., to consider Dedeaux's equal protection claim.

11

## VI.    EXCLUSION OF EVIDENCE OF ORANGE GROVE SETTLEMENT.

¶23.    When reviewing a trial court's decision to allow or disallow evidence, including expert testimony, we are bound by an abuse of discretion standard of review. *Miss. Transp. Comm'n v. McLemore*, 863 So. 2d 31, 34 (Miss. 2003). The trial court ruled that any probative value of evidence of the Orange Grove settlement would be outweighed by its prejudicial nature. *See* M.R.E. 403. The trial court did not identify what factors it considered in weighing the probative value against any prejudicial nature.

¶24.    We have long held that amounts paid in settlement of eminent domain claims are not admissible to prove just compensation. *Eller Media Co. v. Miss. Transp. Comm'n*, 900 So. 2d 1156, 1158 (Miss. 2005); *Brown v. Miss. Transp. Comm'n*, 749 So. 2d 948, 957-58 (Miss. 1999); *State Hwy. Comm'n v. Hyman*, 592 So. 2d 952, 957 (Miss. 1991)).

**Gulfport's Cross-Appeal**

## VII.    MOTION FOR CHANGE OF VENUE.

¶25.    On cross-appeal, Gulfport complains that, since Miss. Code Ann. § 11-27-5 (Rev. 2004) mandates that the petition for condemnation be filed in the jurisdiction where the subject property is situated, venue is jurisdictional, and it was error for the trial judge to grant Dedeaux's motion for change of venue. Gulfport raises this claim for the first time on appeal; therefore it is procedurally barred. *Bennett v. Madakasira*, 821 So. 2d 794, 803 (Miss. 2002).

## VIII.    INTEREST ON EMINENT DOMAIN JUDGMENTS

¶26. The trial court ordered that Gulfport pay Dedeaux eight percent (8%) per annum compounded interest on the amount of the award from the date of filing of the complaint until the date of entry of the judgment along with simple interest of eight percent (8%) per annum after the entry of the judgment. This order was based upon an interpretation of Miss. Code Ann. §§ 75-17-1 & -7 (Rev. 2000) found in *Stovall v. Ill. Cent. Gulf R.R.*, 722 F.2d 190 (5th Cir. 1984), a personal injury action. Section 75-17-1(1) states that "[t]he legal rate of interest on all notes, accounts and contracts shall be . . . ." Section 75-17-7 states "[a]ll judgments or decrees founded on any sale or contract shall bear interest . . . The Fifth Circuit made a distinction between pre-judgment interest which it held should be compounded because the section states interest is to be calculated "according to the actuarial method," § 75-17-(1), and post-judgment interest which it held should not be compounded because the statute states interest should be awarded "at the legal rate," § 75-17-7.

¶27. Eminent domain judgments are not based on notes, accounts, sales or contracts. Because the eminent domain statutory scheme has a specific provision for interest on eminent domain judgments, sections 75-17-1(1) and 75-17-7 do not apply to eminent domain judgments. Miss. Code Ann. § 11-27-19 (Rev. 2004) provides as follows: "Any judgment finally entered in payment for property to be taken shall provide legal interest on the award of the jury from the date of the filing of the complaint until payment is actually made. . . ." Following the Fifth Circuit's interpretation of "legal interest," as set out above, "legal interest" is not compounded, but is, rather, simple interest. Furthermore, there is no distinction between pre-judgment interest and post-judgment interest.

13

¶28. Therefore, the trial court erred when it compounded the interest and when it made a distinction between pre-judgment interest and post-judgment interest.

## CONCLUSION

¶29. We reverse the trial court's judgment and remand for a new trial in accordance with this opinion.

¶30. **ON DIRECT AND CROSS-APPEAL: REVERSED AND REMANDED.**

**SMITH, C.J., COBB, P.J., DIAZ, CARLSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DICKINSON, J., NOT PARTICIPATING.**