# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-00556-SCT

*THE CITY OF GULFPORT, MISSISSIPPI, A
MUNICIPAL CORPORATION*

*v.*

*DEDEAUX UTILITY COMPANY, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/14/2014 |
| TRIAL JUDGE: | HON. WILLIAM R. BARNETT |
| TRIAL COURT ATTORNEYS: | GARY WHITE |
| | HARRY M. ALLEN |
| | PETER C. ABIDE |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY SPECIAL COURT OF EMINENT DOMAIN |
| ATTORNEYS FOR APPELLANT: | GARY WHITE |
| | JEFFREY S. BRUNI |
| ATTORNEYS FOR APPELLEE: | JOSEPH W. GILL |
| | HARRY R. ALLEN |
| | PETER C. ABIDE |
| NATURE OF THE CASE: | CIVIL - EMINENT DOMAIN |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART AND REMANDED - 03/24/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., LAMAR AND COLEMAN, JJ.**

**LAMAR, JUSTICE, FOR THE COURT:**

¶1.     This is the third appeal from the City of Gulfport's taking of the Dedeaux Utility

Company via eminent domain. Dedeaux appealed after the first two trials, and this Court

reversed and remanded both times. The parties have since engaged in a third trial, and now

Gulfport appeals and Dedeaux cross-appeals. We affirm the final judgment, but we reverse

and remand for the trial judge to determine the rate of interest to be applied to the final

judgment and to enter an order requiring payment of that interest.

**FACTS AND PROCEDURAL HISTORY**

¶2. Dedeaux—a privately owned, public utility company—possessed a Certificate of

Public Convenience and Necessity from the Mississippi Public Service Commission to

provide certain water and sewer services within a 2.6 square mile area of Harrison County.

***Dedeaux Utility Co., Inc. v. City of Gulfport ("Dedeaux II")***, 63 So. 3d 514, 518 (Miss.

2011). Gulfport annexed that area in 1994, and in 1996, Gulfport filed a complaint of

eminent domain against Dedeaux in the Special Court of Eminent Domain, Harrison County,

First Judicial District. ***Id.*** According to this Court in ***Dedeaux Utility Co., Inc. v. City of***

***Gulfport ("Dedeaux I")***, 938 So. 2d 838 (Miss. 2006), "[u]nder Miss. Code Ann. § 77-3-17

(Rev. 2000),[1] Gulfport had the right to condemn such utility districts and incorporate them

into its municipal system." ***Id.*** at 840.

---

[1]Section 77-3-17 provides, in pertinent part:

> Any municipality shall have the right to acquire by purchase, negotiation or
> condemnation the facilities of any utility that is now or may hereafter be
> located within the corporate limits of such municipality; provided, however,
> prior to any municipality exercising the right of eminent domain as provided
> herein, the commission shall determine that the certificate of public
> convenience and necessity granted to the utility pursuant to Section 77-3-13
> for the service area wherein such facilities are located, shall be cancelled as
> provided in Section 77-3-21.

Miss. Code Ann. § 77-3-17 (Rev. 2009).

¶3. Dedeaux continued to operate the utility for the next eight years, as Gulfport did not physically take the utility until December 20, 2004, after a jury awarded Dedeaux $3,634,757. *Dedeaux II*, 63 So. 3d at 518. Dedeaux appealed the verdict, and Gulfport cross-appealed. *Id.*

¶4. We discuss *Dedeaux I* more in depth below as necessary, but ultimately this Court reversed and remanded for a new trial, and the parties tried the case again. The second jury awarded Dedeaux $5,131,676 for the taking. *Dedeaux II*, 63 So. 3d at 518. Dedeaux again appealed the verdict, and Gulfport again cross-appealed. In *Dedeaux II*, this Court addressed many more issues than it did in *Dedeaux I*, and again, we address the relevant analysis more in depth below as necessary. But the *Dedeaux II* Court also reversed and remanded for a new trial, and the parties tried the case for a third time.

¶5. This Court appointed Senior Status Judge William R. Barnett to preside over the third trial.[2] Judge Barnett ultimately held nine hearings on pretrial motions, beginning March 5, 2012, until the date the case was tried, and he entered several orders on those motions.[3] The parties tried the case in December 2013, and the third jury awarded Dedeaux a total of $8,063,981 for the taking. Specifically, the verdict form read:

> 1. What is the fair market value of the tangible assets owned by [Dedeaux] as measured by the "depreciated replacement costs" of those assets, the intangible assets, Certificate of Public Convenience and Necessity for both water and sewer services owned by [Dedeaux], the land, easements and transitional assistance as of the date the petition was filed, December 3, 1996?

[2]Judge T. Larry Wilson had presided over the first two trials.

[3]We detail the relevant facts below, as necessary, relating to these motions, the trial judge's rulings, and the specific arguments made by the parties.

$7,082,778.00

2. What is the fair market value of the tangible assets added to [Dedeaux] from the date the Petition was filed on December 3, 1996 and the date the assets of [Dedeaux] were taken by the City on December 20, 2004?

$981,203.00

¶6. Added together, those numbers total $8,063,981.00. The trial judge's Final Judgment took into account the previous judgments entered against Gulfport and the setoff amount (which ***Dedeaux II*** mandated and is discussed more in depth below), providing:

A. The amount set forth in Special Interrogatory 1., $7,082,778.00, shall be credited by the previous October 7, 2008 judgment amount of $5,131,676.00 [the amount awarded by the jury after the second trial], leaving an additional award due to [Dedeaux] in the amount of $1,951,102.00, with legal interest from the date of the filing of the Complaint, December 3, 1996 through July 25, 2004, and from December 6, 2004 through March 23, 2008, and from June 2, 2008 until the date payment is actually made, pursuant to [the Court's prior orders].

B. The amount set forth in Special Interrogatory 2., $981,203.00, shall be credited by the sum of $253,086.00, pursuant to the Court's Order of December 16, 2013, leaving an award of $728,117.00, with legal interest from the date the City took possession, December 20, 2004 until the date payment is actually made.

Gulfport filed two-post trial motions, which the trial judge denied after hearings. Gulfport now appeals to this Court, and Dedeaux cross-appeals.

¶7. Gulfport raises thirteen issues on appeal. And while we have given careful consideration to each of Gulfport's arguments, we find that only five of them warrant discussion. We discuss these issues in the order in which Gulfport presented them and recite them verbatim below in our analysis. As for its cross-appeal, Dedeaux specifically requests

4

that this Court *not* consider those issues if it finds that none of Gulfport's issues requires reversal.

## ANALYSIS

**1.  Whether the trial court erred as a matter of law by requiring the parties to use different dates for valuing the assets existing on the date the Petition was filed (December 3, 1996) and valuing the assets added between the date the Petition was filed and the date the utility system was actually transferred to the City (December 20, 2004).**

¶8.     Prior to the third trial, Dedeaux filed a "Motion for Partial Summary Judgment or Alternatively, Declaratory Judgment on the Issue of Dates to be Used in Valuation of Dedeaux Utility Company." Citing portions of this Court's opinion in ***Dedeaux II***, Dedeaux asserted that it intended "to evaluate the 1996 assets that existed at the time the Petition was filed, and further evaluate the additional assets accumulated between 1996 and 2004 as of the date of transfer in 2004."

¶9.     Dedeaux asserted that it had "requested Gulfport's agreement" to this interpretation, but that Gulfport had refused to disclose its intent regarding valuation dates. As such, Dedeaux requested declaratory judgment and/or partial summary judgment "on the following matters:  a) That any tangible assets that existed as of December 1996, the time of the filing of the Petition, should be valued as of that date [and] b) Any additional tangible assets accumulated between 1996 and 2004 should be valued as of December 2004, the date of transfer." Dedeaux also argued that the interpretation of ***Dedeaux II*** was a legal issue for the trial court, not for the parties' respective expert witnesses.

5

¶10. Gulfport responded and argued that Dedeaux was "asking the Court to hold a ***Daubert*** hearing prior to the exchange of expert reports."[4] Gulfport argued further that ***Dedeaux II*** clearly established that the appropriate date of valuation was December 20, 2004, and that Dedeaux's position regarding two valuation dates violated the principle of valuing utility companies as a "going concern."

¶11. The trial judge heard argument on Dedeaux's motion and ultimately found in Dedeaux's favor. The trial judge's order provided, in pertinent part:

> At trial, [Dedeaux] shall be entitled to due compensation for its property as of December 20, 2004, to include the fair market value of its property as of December 3, 1996, plus the worth of all extensions, additions and improvements of the property which were necessarily and in good faith made or commenced after December 3, 1996, in accordance with its operating authority, less any setoffs, including revenues earned, arising out of its continued use of the property between December 3, 1996, and December 20, 2004.

The trial judge entered another order closer to trial that added to his first order and stated his finding more clearly:

> [Dedeaux] is entitled to recover the fair market value of all CIACs[5] added to its holdings between December 3, 1996, and December 20, 2004, and they should be valued as of December 20, 2004. The value of the CIACs added to [Dedeaux's] holdings between December 3, 1996, and December 20, 2004,

---

[4]***Daubert v. Merrell Dow Pharmaceuticals, Inc.***, 509 U.S. 579, 113 S. Ct. 278b, 125 L. Ed. 2d 469 (1993).

[5]This Court noted in ***Dedeaux I*** that "[a]pproximately 50% of Dedeaux's physical assets were contributed to Dedeaux by land developers, called "'contributions in aid of construction ["CIAC"].'" ***Dedeaux I***, 938 So. 2d at 840. These assets included pipelines installed by and paid for by the developers, as well as easements, rights-of-way, wells, lift stations and tank sites. *Id.* And although Dedeaux never paid any consideration for the CIAC, title to the pipelines transferred to Dedeaux once the pipelines were connected to its plant. *Id.*

shall be reduced by any setoffs, including the revenues to [Dedeaux] generated during that period by the added CIACs, with revenues defined as the income generated from the added CIACs' sale of goods or services before any costs or expenses.

¶12.    Based on these orders, the parties' respective experts each presented two valuations to the jury—one value for the assets existing on the date that Gulfport filed its petition (December 3, 1996), and one value for the assets added to Dedeaux's system between the date the petition was filed and the date that Gulfport physically took possession of the system (December 20, 2004). Gulfport's expert, James Stokes, valued Dedeaux's assets existing as of December 3, 1996, at $4,109,289, and he valued its assets added after that date at $583,850, for a total valuation of **$4,693,139**. Dedeaux's expert, James Elliott, valued Dedeaux's assets existing as of December 3, 1996, at $10,056,267, and he valued its assets added after that date at $1,378,555, for a total valuation of **$11,434,822**.

¶13.    In its first issue on appeal, Gulfport reiterates its argument before the trial judge that *Dedeaux II* mandates that all of Dedeaux's assets be valued as of the date of the physical transfer, December 20, 2004. Gulfport also argues that using two valuation dates "is contrary to settled Mississippi law concerning the condemnation of private utility companies"; specifically, that they must be valued as a "going concern." Gulfport argues further that the two valuation dates  were "inherently confusing to the jury and led . . . to the jury rendering a verdict without proper deliberation."

¶14.    Conversely, Dedeaux argues that only the assets acquired after the time the petition was filed are to be valued at the time of the physical transfer; pre-existing assets are to be valued at the time the petition was filed. Dedeaux argues that using two valuation dates does

7

not violate the "going concern" doctrine, stating that "[i]f evidence of the values of individual assets can be considered, then it should not matter (for purposes of valuing the business as a 'going concern') if those individual assets are valued on different dates." Dedeaux argues finally that the jury was not confused, as both parties "clearly defined the assets of Dedeaux which were to be valuated on each of the two valuation dates," and "the jury received clear instructions to value different assets for each valuation date."

¶15.   We  agree with Dedeaux.  Both parties focus chiefly on Paragraph 59 of this Court's opinion in *Dedeaux II*:

> It is undisputed that Dedeaux operated the utility between December 3, 1996, and December 20, 2004. During this period, Dedeaux had a statutory duty to "rende[r] reasonably adequate service . . . ." Miss. Code Ann. § 77–3–21 (Rev. 2009). As such, in the interest of doing "substantial justice" in the eminent-domain proceeding so as to provide Dedeaux with its constitutional right to just compensation, this Court finds that the "ordinary rules of valuation must . . . change . . . ." *Fuller*, 409 U.S. at 492, 93 S. Ct. 801; *Ill. Cities Water Co.*, 144 N.E.2d at 731–32. *In short, regarding privately owned, public-utility companies, fair-market value shall not be limited to the date of taking.* Rather, in these specific cases, the applicable date for purposes of determining due compensation is the actual date the property is transferred (here, December 20, 2004). Therefore, Section 11–27–19 is unconstitutional as applied to privately owned, public-utility companies. *See* Miss. Code Ann. 11–27–19 (Rev. 2004). As the trial court held otherwise, this Court concludes that it erred. On remand, this Court instructs the trial court that:

>> *the jury may consider not only the value of the property at the time the petition was filed but also the worth of all extensions, additions, and improvements of the . . . property which were necessarily and in good faith subsequently made or commenced by [Dedeaux] in accordance with its operating authority.*

> *Ill. Cities Water Co.*, 144 N.E.2d at 731–32. *These figures should be "subject to setoffs arising out of [Dedeaux's] continued use of the property during that time[,]" including revenues earned.* *Iowa Elec.*, 67 N.W.2d at 47.

***Dedeaux II***, 63 So. 3d at 537 (emphasis added). While some of the language above could be read—in isolation—to support Gulfport's interpretation, simply put, when read in its entirety, we clearly stated that two valuation dates be considered. The use of two valuation dates makes determining the amount of the setoff much easier, and it also allows interest to be more easily calculated, so that Gulfport will not have to pay interest from the date of the petition on assets that were not yet in existence.

¶16.    We are not persuaded by Gulfport's "jury-confusion" argument. Both parties' experts clearly differentiated between the two valuation dates being used. And Dedeaux is correct that the jury clearly was instructed to value different assets on different dates. Nor are we persuaded by Gulfport's "going-concern" argument. Simply because two valuation dates were used does not mean that Dedeaux somehow was not valued as a "going concern." As this Court wrote in ***Dedeaux I***:

> The elements ordinarily considered in ascertaining the value of the utility are the current value of the tangible property of the company, the earnings, both present and future, of the company, the "going value" of the plant, and the amount of money required to put the plant in good condition . . . [the treatise] goes on to list other factors to be considered: earnings, *id*. at § 15.07[1]; cost of construction, *id*. at § 15.07[2]; reproduction costs, *id*. at § 15.07[3]; capital stock, *id.* at § 15.07[4]; and intangible property, *id*. at § 15.10. *Finally, [the treatise] emphasizes the fact that, since all of these different factors must be considered, different methods of appraisals must be used and one method of appraisal will not be reliable for evaluating all of the different facts.*

***Dedeaux I***, 938 So. 2d at 843 (emphasis added). In sum, we reject Gulfport's argument that this Court mandated a one-date valuation method in ***Dedeaux II***, and we affirm on this issue.

9

**2. Whether the trial court erred as a matter of law in limiting the setoff to which the City is entitled to the revenues produced by the assets added after December 3, 1996.**

¶17.    The entirety of Gulfport's argument on this issue in its initial brief is as follows:

> In ***Dedeaux II***, the Court noted that " . . . Dedeaux operated the utility between December 3, 1996, and December 20, 2004." The Court then stated that the value of the Dedeaux assets at December 20, 2004, "should be 'subject to setoffs arising out of [Dedeaux's] continued use of the property during that time[,]' including revenues earned." Counsel for the City and Dedeaux agreed that, by this language, the Court meant that the setoff should be the revenue generated by the entire Dedeaux utility system between December 3, 1996, and December 20, 2004.[6] However, the trial court disagreed, holding that the ***Dedeaux II*** Court meant that the setoff should be the *gross revenue, with no deductions, generated, not by the entire utility system, but only by the facilities which were added to the system between December 3, 1996, and December 20, 2004.* The trial court noted that the term "revenues" meant gross receipts.
>
> The City believes the term "revenues" used by the Court in ***Dedeaux II*** is subject to differing interpretations. It seems to the City that the correct interpretation depends upon what the Court was trying to accomplish by the setoff. The City still believes that the term should be interpreted to mean the cash flow generated by *the entire utility system* after December 3, 1996. The trial court misapplied the law as stated by the Court in ***Dedeaux II.*** The City submits that it was deprived of a substantial right which affected the outcome of the jury verdict.

(Emphasis added, citations omitted.) And in its reply brief, Gulfport specifically asks this Court to "clarify [its] ruling on the setoff." So in short, Gulfport does not really advance an argument on this point, but rather asks this Court to clarify whether the setoff should be the revenue generated by the utility system as a whole, or whether it should be only the revenue

---

[6]Dedeaux confirms this assertion in its brief: "While Dedeaux initially agreed with Gulfport that the setoffs should include the revenues generated not only from the assets added after December 3, 1996, but also from the pre-existing assets, *Dedeaux has since recognized that the trial court correctly decided otherwise . . . .*" (Emphasis added.)

generated by the "extensions, additions and improvements" added to the system after December 1996.

¶18. Dedeaux asserts that the latter definition of setoff is the definition envisioned by this Court in *Dedeaux II*, and we agree. This Court held there that:

> On remand, this Court instructs the trial court that:
>
>> the jury may consider not only the value of the property at the time the petition was filed but also the worth of all extensions, additions, and improvements of the . . . property which were necessarily and in good faith subsequently made or commenced by [Dedeaux] in accordance with its operating authority.
>
> *Ill. Cities Water Co.*, 144 N.E.2d at 731–32. These figures should be "subject to setoffs arising out of [Dedeaux's] *continued use of the property during that time*[,]" including revenues earned. *Iowa Elec.*, 67 N.W.2d at 47.

*Dedeaux II*, 63 So. 3d at 537 (emphasis added).

¶19. This Court's instruction that the value of Dedeaux's property was to be subject to setoffs arising out of its *continued use of the property during that time* was referring to the revenues generated from the added assets. In other words, if Gulfport physically had taken the property when it filed its Petition, then Dedeaux would have stopped its use of the property and therefore its generation of revenue, and no setoffs would have been necessary. Stated another way, but for Gulfport's delay in physically taking the property, the setoff issue never would have arisen. So because the issue being decided in *Dedeaux II* was how to treat the added assets, it follows that this Court intended the setoff to be calculated from the revenues generated by those assets only. That is the interpretation the trial judge adopted, and we affirm that interpretation.

11

**3. Whether the Court erred as a matter of law by requiring the City to pay interest from the date of the filing of the petition (December 3, 1996), instead of the date of taking actual possession (December 20, 2004), on the amount of the jury award pertaining to the value of the assets existing on the date the Petition was filed (December 3, 1996).**

¶20. About a month after the trial, Dedeaux filed a Motion for Entry of Judgment, asking the trial judge to enter the Final Judgment that it had submitted. Dedeaux explained its position on the date on which it thought interest should begin to accrue:

> After the first trial in 2004, the City paid interest on the <u>award</u> back to the filing of the Complaint in 1996. After the second trial, in 2008, the City paid interest on the <u>additional award</u> back to the filing of the Complaint in 1996 . . . . Dedeaux has once again calculated interest on the <u>additional award</u> back to the filing of the Complaint in 1996. Dedeaux has calculated interest on the additional assets to go back to December 20, 2004 based on the two valuation dates that the Court ordered and the jury considered.

Gulfport disagreed with Dedeaux's position, informing the trial judge via letter that its position was

> that any interest, if any, should not begin to accrue until the City actually took possession of the facilities since Dedeaux continued to operate the facilities until December 20, 2004, resulting in substantial financial benefit to Dedeaux and its owners. The City also contends that any interest, if any, should end upon the City's payment of the original judgment entered in this cause.

After a hearing, the trial judge found in Dedeaux's favor, ruling in his Final Judgment that:

> A. The amount set forth in Special Interrogatory 1., $7,082,778.00, shall be credited by the previous October 7, 2008 judgment amount of $5,131,676.00 [the amount awarded by the jury after the second trial], leaving an additional award due to [Dedeaux] in the amount of <u>$1,951,102.00</u>, *with legal interest from the date of the filing of the Complaint, December 3, 1996 through July 25, 2004, and from December 6, 2004 through March 23, 2008, and from June 2, 2008 until the date payment is actually made, pursuant to [the Court's prior orders]*.

12

B.  The amount set forth in Special Interrogatory 2., $981,203.00, shall be credited by the sum of $253,086.00, pursuant to the Court's Order of December 16, 2013, leaving an award of $728,117.00, *with legal interest from the date the City took possession, December 20, 2004 until the date payment is actually made.*

(Emphasis added.)

¶21.  Gulfport now reasserts its argument on appeal, asserting that it

> takes issue with the decision of the trial court to assess interest from the date of the filing of the eminent domain petition rather than from the date the City actually acquired possession of the assets.  The legislative intent was clear and unambiguous in Miss. Code Ann. § 11-27-19[7] that the date of valuation and the date of accrual of interest was the same – until ***Dedeaux II***.  The ***Dedeaux II*** decision has made § 11-27-19 ambiguous.

Gulfport argues further that "requiring it to pay interest from the date of filing the petition on assets and on value which did not exist on that date does not amount to substantial justice for its citizens."[8]  Gulfport requests this Court to "hold that the accrual of interest begins

---

[7]Section 11-27-19 provides, in pertinent part:

> Evidence of fair market value *shall be established as of the date of the filing of the complaint.* Any judgment finally entered in payment for property to be taken *shall provide legal interest on the award of the jury from the date of the filing of the complaint until payment is actually made*; provided, however, that interest need not be paid on any funds deposited by the plaintiff and withdrawn by the defendants prior to judgment.

Miss. Code Ann. § 11-27-19 (Rev. 2004) (emphasis added).

[8]We agree with this statement in the abstract.  But that simply is not what happened here.  As detailed above, the trial judge ruled that the City must pay interest from December 1996 on the value of the system on that date, but only from 2004 on the assets added post-1996.  Indeed, Gulfport admits as much in its brief in the paragraph immediately following the above quoted language: "The City was not required to pay interest on the entire judgment from the date of the filing of the petition.  Instead, the City was required to pay interest from the date the City took possession of the system on the portion of the judgment pertaining to the facilities coming into existence after the filing of the petition . . . ."

13

from the date of valuation of the assets in conformity with the express intent of the legislature."

¶22.    Dedeaux argues that Gulfport's accrual position is "premised solely upon its argument that there is only one relevant date of valuation and not two." Dedeaux further explains its position as follows:

> [W]hile this Court held in *Dedeaux II* that § 11-27-19 "is unconstitutional as applied to privately owned, public-utility companies," it is clear from the context of the Court's decision that such ruling was only with respect to the after-acquired inverse condemnation assets and not those assets existing at the time the petition was filed. As such, §11-27-19 remains constitutional and applicable to those assets existing at the time the petition was filed . . . . Because this statute remains constitutional and applicable to pre-existing assets, interest on the jury's award for the due compensation for such assets should run "from the date of the filing of the complaint" as legislatively directed . . . . Because there should be two dates for valuation, there should be two dates upon which interest should accrue.

¶23.    Dedeaux points out further that the two-date accrual method employed by the trial judge is consistent with this Court's decision in *Dedeaux II*. There, the trial court granted Gulfport recovery of $698,604.86 that it had overpaid via compounded interest, but denied its request for "interest on the overpayment to Dedeaux." *Dedeaux II*, 63 So. 3d at 544. This Court affirmed the trial judge, writing that

> Section 11–27–19 provides only that "[a]ny judgment finally entered *in payment for property to be taken* shall provide legal interest on the award of the jury from the date of the filing of the complaint until payment is actually made . . . ." Miss. Code Ann. § 11–27–19 (Rev. 2004) (emphasis added). This provision is clearly inapplicable to Gulfport's request for interest on the overpayment. Therefore, this Court concludes that the trial court did not abuse its discretion in denying Gulfport's "Motion to Recover Excess Interest," insofar as Gulfport sought interest on the overpayment.

14

*Id.* at 544-45. As Dedeaux points out, this Court "recognized the continuing applicability of § 11-27-19 to assets existing at the time the petition was filed (*i.e.*, those assets for which interest was improperly compounded prior to **Dedeaux I**), holding that the statute did not authorize the payment of interest to Gulfport, the condemnor."

¶24.    We agree with Dedeaux's arguments. Gulfport's accrual argument makes sense only if there is one relevant date of valuation and not two—an argument which we previously have rejected. As such, we find that the trial judge did not err in his interest accrual ruling.

> **4. Whether the Court erred as a matter of law by requiring the City to pay interest at the rate of eight percent (8%) per annum.**

¶25.    As quoted above, the trial judge ordered in his Final Judgment that Gulfport pay Dedeaux "legal interest," but did not specify a rate.[9] Gulfport filed a post-trial motion, asking the trial judge to "determine a fair and equitable interest rate to be paid on the Final Judgment in this cause." Gulfport noted that Section 11-27-19 mandated "legal interest" on an eminent-domain judgment, but that "legal interest" was not defined in that section. As such, Gulfport asked the trial judge to "determine a fair and equitable interest rate to be paid on the Final Judgment based upon the rates paid on invested funds during the time period in which the eminent domain action was pending."

¶26.    Dedeaux responded and argued that "legal interest" means "statutory rate," and that

---

[9]This tracks the language of the eminent domain statute: "Any judgment finally entered in payment for property to be taken shall provide *legal interest* on the award of the jury from the date of the filing of the complaint until payment is actually made . . . ." Miss. Code Ann. § 11-27-19 (Rev. 2004) (emphasis added).

15

Section 75-17-1[10] sets the statutory rate at eight percent.[11] Dedeaux also argued that Gulfport already had paid interest on the awards from the two prior trials at eight percent, and that this was the first time that Gulfport had argued that "'simple legal interest' meant anything other than eight percent per annum since it [had] paid that rate of interest twice before in satisfaction of the legal interest due from the date of the two earlier Judgments."[12] Dedeaux argued finally that an eight-percent interest rate was the "law of the case," pursuant to *Dedeaux I* and *Dedeaux II*.

¶27.    After a hearing, the trial judge ruled in Dedeaux's favor, finding that "the legal interest rate is the statutory rate set forth in MCA 75-17-1, which is 8%." Gulfport now reasserts its argument on appeal:

> the term "legal interest" referred to in Miss. Code Ann. § 11-27-19 is analogous to the term "statutory rate." However neither of these terms refer to any rate contained in Miss. Code Ann. § 75-17-1, which by its language pertains to notes, accounts and contracts. Instead, the term "legal interest" as first used in Miss. Code Ann. § 11-27-19 actually refers to the "statutory rate" of interest pertaining to interest on judgments and decrees which was previously contained in Miss. Code Ann. § 75-17-7 and its predecessor statutes . . . . Accordingly, the legal interest in the eminent domain statute is, by default, a rate "set by the judge hearing the complaint."

(Citations omitted.)

---

[10]Section 75-17-1 provides, in pertinent part: "The legal rate of interest on all notes, accounts and contracts shall be eight percent (8%) per annum . . . . " Miss. Code Ann. § 75-17-1(1) (Rev. 2009).

[11]Gulfport agrees that "legal interest" means "statutory rate," but it does not agree that Section 75-17-1 applies.

[12]Gulfport does not contest these assertions.

16

¶28.     As mentioned above, both parties agree that the "legal interest" in Section 11-27-19 is analogous to the "statutory rate" of interest.  But Dedeaux asserts that the statutory rate is found in Section 75-17-1, while Gulfport alleges that it is found in Section 75-17-7.  We agree with Gulfport, based on the statutes' plain language.

¶29.     Section 75-17-1 states, in pertinent part, that "[t]he legal rate of interest on all *notes, accounts and contracts* shall be eight percent (8%) per annum, calculated according to the actuarial method . . . . " Miss. Code Ann. § 75-17-1(1) (emphasis added).  Clearly, Section 75-17-1 does not apply in this case, because we are dealing with an eminent-domain judgment, not a note, account, or contract.     Section 75-17-7—the applicable statute—provides:

> All judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt on which the judgment or decree was rendered. *All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint.*

Miss. Code Ann. § 75-17-7 (Rev. 2009) (emphasis added).

¶30.     Here, had the trial judge arrived at an eight-percent rate after deliberation, we would have reviewed that ruling for an abuse of discretion. *See, e.g.*, **Union Carbide Corp. v. Nix**, 142 So. 3d 374, 394 (Miss. 2014).  But it is clear to us from the trial judge's order that he thought he had no discretion, and that Section 75-17-1 *mandated* that rate.  So we agree with Gulfport that the trial judge should have set a reasonable interest rate, and that he erred when he ruled that Section 75-17-1's eight-percent rate was mandatory.  As such, we remand this

action to the Harrison County Special Court of Eminent Domain for the limited purpose of determining a reasonable rate of interest and issuing an order for payment of that interest.[13]

**5. Whether the trial court erred as a matter of law by refusing to grant a new trial based on the jury's compromise verdict.**

¶31.    In its Motion for Judgment Notwithstanding the Verdict, Entry of Remittitur or New Trial, Gulfport argued that the trial judge should order a new trial based on the jury's "compromise verdict."  Specifically, Gulfport alleged that it

> valued the assets existing on December 3, 1996, at $4,109,289 and Dedeaux valued those assets at $10,056,267.  These two competing values totaled [sic] $14,165,556, which, if divided by [two] results in $7,082,778.  The jury returned a verdict indicating the fair market value of the assets at December 3, 1996 was $7,082,778—exactly one half of the total of the competing valuations.  The City valued the assets added between December 3, 1996 and 2004 at $583,850 and Dedeaux valued those assets at $1,378,555.  These two competing values totaled $1,962,405, which, if divided by [two] results in $981,203—exactly one half of the competing valuations.  Clearly the jury averaged the two separate valuations.  The City submits that averaging the two separate valuations is the equivalent of a "quotient verdict" which is prohibited.  The Court should order a new trial in this case based on the jury's compromise verdict.

The trial judge denied Gulfport's motion after argument, and Gulfport now repeats this argument on appeal.

¶32.    Dedeaux notes first that the trial judge specifically instructed the jury that it was impermissible to arrive at a "quotient verdict."[14]  Dedeaux also argues that Gulfport simply

---

[13]We do not agree with Dedeaux that Gulfport is barred from making its interest-rate argument here, because this third trial was, in essence, a trial anew.

[14]Instruction No. 3 provided: "The Court instructs the jury that in fixing the amount of your verdict in this case you are not to return a "Quotient Verdict"; that is to say, that in no event can you agree beforehand to return a verdict based upon the result of adding such amounts as each of you individually may desire to award and by dividing the sum obtained

18

has presented no evidence that this jury award was an impermissible "compromise" or "quotient" verdict, and we agree. This Court previously has held that

> A quotient verdict may be defined as one resulting from an agreement whereby each juror writes down the amount of damages to which he [thinks] the party is entitled. These several amounts are added together and divided by the number of jurors. The quotient thereby obtained is accepted as the amount of the verdict . . . . *The test is whether are held agreed [sic] beforehand to be bound by the result reached*. Such a prior agreement precludes subsequent reconsideration, and results in a sum which is not the result of the deliberate judgment of the jury. However, the *evidence must show affirmatively that the jurors agreed in advance* to the return of such a verdict.

*Index Drilling Co. v. Williams*, 137 So. 2d 525, 530 (Miss. 1962) (citations omitted) (emphasis added).

¶33. Here, Gulfport simply has presented no evidence that the jurors agreed in advance individually to determine their damage valuations and then average them. And the only case cited by Gulfport to support its position, *Times Square Realty, Inc. v. City of Grenada*, 421 So. 2d 1053 (Miss. 1982), is inapposite to these facts. There, an appraiser averaged the amounts from two different appraisal methods to reach his ultimate valuation. *Id.* at 1054. This Court said

> This averaging of two separate and entirely different approaches to value in eminent domain cases is of first impression in this state. We hold that allowing this to be done is reversible error. The reasons therefor should be obvious. In the first place, each method has its own separate and distinct requirements. Each is supposed to be a fair and equitable amount owed to the condemnee. The final figure arrived at by the appraisal witness should not have any vagueness about it.

---

by an [sic] number."

*Id.* at 1055. But that language simply addresses the admissibility of expert testimony—it has nothing to do with the propriety of a jury verdict. Because Gulfport has presented no evidence that the jurors agreed beforehand to engage in a "compromise verdict," we decline to reverse on this issue.

### *Dedeaux's Cross-Appeal*

¶34. As mentioned above, Dedeaux raises four issues on cross-appeal. But Dedeaux specifically requests that this Court *not* consider its cross-appeal if it finds that none of Gulfport's issues require reversal. So, because we affirm the final judgment and remand only for the limited purpose of determining the applicable interest rate and ordering payment of that rate, we do not consider Dedeaux's cross-appeal.

## CONCLUSION

¶35. After careful consideration, we find that none of the issues raised by Gulfport warrants reversal and affirm the final judgment. But we reverse the trial judge's post-trial order denying Gulfport's motion to establish the interest rate, and we remand this action to the Harrison County Special Court of Eminent Domain for the limited purpose of determining the applicable interest rate and entering an order requiring payment of that interest. We decline to address Dedeaux's cross-appeal.

¶36. **AFFIRMED IN PART; REVERSED IN PART AND REMANDED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR.**